MACY et al. v. BROWNE et al.

(Circuit Court of Appeals, Second Circuit. June 8, 1915.)

No. 158.

1. CUSTOMS DUTIES ⚖➡22—IMPORTATION OF TEA—STATUTORY REGULATIONS—. CONSTRUCTION.

The Tea Law (Act March 2, 1897, c. 358, 29 Stat. 604), as amended by Act May 16, 1908, c. 170, 35 Stat. 163 (Comp. St. 1913, § 8786), providing for the creation of a Board of Tea Appeal, for the adoption of standard samples, and confiding to the board the authority to determine whether samples for tea offered for entry are up to the standards, and requiring that the purity, quality, and fitness for consumption of tea shall be tested, prohibits the importation of tea which falls below the standard in purity, quality, and fitness for consumption, but does not authorize the rejection of tea containing coloring matter, unless the coloring matter and other impurities make the tea below standard in purity, quality, or fitness for consumption.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 18; Dec. Dig. ⚖➡22.]

2. CUSTOMS DUTIES ⚖➡22—IMPORTATION OF TEA—FINDINGS OF TEA BOARD.

The Board of Tea Appeal, created by Tea Law, as amended by Act May 16, 1908, with authority to determine whether samples of tea offered for entry are or are not inferior to the standards in purity, quality, or fitness for consumption, has the exclusive power to determine whether tea offered for importation is equal to the standards in purity, quality, or fitness for consumption, provided it follows the directions of the statute in determining the question, and the board may not reject tea containing coloring matter not sufficient in quantity or character to bring the tea below the standard in purity, quality, or fitness.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 18; Dec. Dig. ⚖➡22.]

3. INJUNCTION ⚖➡112—GOVERNMENT OFFICERS—NECESSITY FOR RELIEF.

Where tea brought to this country for importation has once been rejected, though superior to the standard in purity, in quality, or in fitness for consumption, on the ground that it contains coloring matter, not affecting its purity, quality, or fitness, a suit by the importer to restrain the federal tea board from excluding the tea was not premature.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 197; Dec. Dig. ⚖➡112.]

4. CUSTOMS DUTIES ⚖➡22—IMPORTATION OF TEA—STATUTES—CUSTOMS REGULATIONS.

Under Tea Law, as amended by Act May 16, 1908, providing for a Board of Tea Appeal, with authority to determine whether samples of tea offered for entry are or are not inferior to standards in purity, quality, or fitness for consumption, and empowering the Secretary of the Treasury to enforce the act by appropriate regulations, treasury regulations directing the board to reject tea which contains any coloring matter, though the board may be convinced, as the result of all the tests they may apply under the statute, that the coloring matter is present in such harmless quantity that the tea is not inferior to the standards in purity, quality, or fitness, are inconsistent with the statute.

[Ed. Note.—For other cases, see Customs Duties, Cent. Dig. § 18; Dec. Dig. ⚖➡22.]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York, dismissing the bill. Complainants are importers of tea. Respondents, United States General Appraisers, are members of the appellate board, created under the act of March 2, 1897 (as amended May 16, 1908), known as the Tea Law, to re-examine teas already examined by tea examiners appointed under the same act. The function of these examiners and re-examiners is to determine whether or not teas offered for import comply with the requirements, imposed by the Tea Law for admission into the United States.

The act is entitled "An act to prevent the importation of impure and unwholesome teas." Its first section makes it unlawful "to import or bring into the United States any merchandise as tea, which is inferior in purity, quality and fitness for consumption to the standards provided in section 3 of this act." The third section provides that the Secretary of the Treasury, upon recommendation of the board, shall fix and establish uniform standards of purity, quality and fitness for consumption of all kinds of tea imported, and shall procure and deposit in certain custom houses duplicate samples of such standards, in sufficient number to supply the importers and dealers in tea at all ports desiring the same at cost. All teas, or merchandise described as tea, "of inferior purity, quality and fitness for consumption to such standards," are declared to be within the prohibition of the first section. Details as to examination and re-examination are provided for, the seventh section concluding with the statement: "That in all cases of examination and re-examination of teas, or merchandise described as tea, by examiners or Boards of United States General Appraisers under the provisions of this act, the purity, quality, and fitness for consumption of the same shall be tested according to the usages and customs of the tea trade, including the testing of an infusion of the same in boiling water, and, if necessary, by chemical analysis."

The standards have been duly established and duplicate samples deposited in the custom houses. Certain green teas of complainants were offered by them for import, were rejected by the examiner, and are now before respondents for re-examination. The contention of complainants is that respondents threaten, upon such re-examination, to adopt a method of examination and to apply a criterion for judging the admissibility of the teas, neither of which is authorized by the Tea Act.

Section 10 gave to the Secretary of the Treasury "power to enforce the provisions of this act by appropriate regulations." He has prescribed a code of regulations, to two of which, Nos. 22 and 23, complainants take exception. They provide for what is called the "Read test," to determine whether the tea being examined contains "artificial coloring or facing matter." They further provide that "as soon as coloring or facing matter is identified, then the tea should be rejected," but "if the tea is clearly equal to the standard as regards coloring or facing matter" apparently it is not to be rejected. In other words, if the standard of a particular kind or grade of tea contains no coloring or facing matter, offered tea which contains any coloring or facing matter, however small in quantity, must be rejected. If the standard contains some such coloring or facing matter, all tea which contains such matter in excess of 'the standard must be rejected. The examiner rejected complainant's teas "for color; that is to say, on the ground that they were inferior in purity to said standards established as aforesaid, by reason of the alleged inclusion therein of certain coloring matter."

The opinion of Judge Hough will be found in 215 Fed. 456.

Evarts, Choate & Sherman, of New York City (J. H. Choate, Jr., of New York City, of counsel), for appellants.

W. L. Wemple, Sp. Asst. Atty. Gen., of New York City, for appellees.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. Much testimony was taken, and the District Court found that when complainants offered their tea for entry the standard samples contained no coloring matter whatever, but did contain a far greater amount of other foreign substances than did complainants'; that the tea refused entry is worth in the open market nearly four times as much per pound as is the standard sample by which its acceptance or rejection was gauged; that the sole cause for rejecting the tea in question is that it showed coloring matter, to wit, Prussian blue, in proportion ranging from 9 to 19 parts of blue in a million of other and unobjected to elements. It is conceded by both sides that Prussian blue cannot be proved to produce any deleterious results; that it is found in the United States Pharmacopeia as a drug sometimes used for common purposes. A careful study of the testimony results in the conclusion that these findings of fact are entirely accurate.

[1, 2] Manifestly Congress undertook to deal fully with the subject of tea importation. It provided for the creation of this Board of Tea Appeal; also for the adoption of physical standard samples; to the members of the board it confided the authority—and the sole authority—to determine whether samples of tea offered for entry are or are not inferior to the standards in the particulars specified. Congress, however, has specified carefully the particulars in which this inferiority must be found in order to reject the tea. The question to be answered upon every examination is: Are the teas "of inferior purity, quality, and fitness for consumption to such standards"? Although the sentence is conjunctive, we think it may fairly be construed disjunctively, as providing that tea shall be prohibited which falls below the standard either in purity, in quality, or in fitness for consumption.

It is now contended for the government that although the board may be satisfied that a certain lot of tea is fully equal, indeed superior, to the standard—in purity, in quality, and in fitness for consumption—the board must nevertheless reject it, if they find that it contains coloring or facing matter. It does not seem to us that the statute warrants such rejection, unless the coloring matter plus other impurities makes the tea below standard *in purity, or* the coloring matter makes the tea below standard *in quality, or* the coloring matter makes the tea less *fit for consumption* than the standard. Within the field of investigation confided to them the Board of Examiners are the sole judges; but they have been given no authority to extend the field of investigation beyond the limits staked out by Congress. If Congress had intended that tea should be rejected because of coloring matter which was not sufficient in quantity, or such in character as to bring it below standard in the three particulars specified, it must be presumed that Congress would have so stated in the act. We do not see that Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525, applies. That case held merely that the board was the final judge in its allotted field; it did not indicate that the board had any power to extend that field.

The record shows that this tea is superior to standard in all three specified requirements. It also shows that nevertheless it will be re-

jected as soon as the board examines it, because of a fourth unspecified requirement. The members of the board are appointed by the Secretary, who has the power to remove them; it is not disputed that they will act in conformity to the requirements he has prescribed for their guidance in regulations 22 and 23. Indeed, upon inquiry as to the issues by the District Judge, counsel for the government conceded that it was the intention of the officers of the government "to keep out all the tea that has any coloring matter in it, no matter whether such matter was put into it, so far as the observer can discover, for the purpose of coloring it or not, or whether it is mere carelessness or accident"; also that teas will be rejected "if the said teas are found to contain matters adapted for use as coloring or facing of any kind or in any quantity, irrespective of whether the same is or is not used or applied so as to conceal damage or inferiority."

[3] If the government officers have no authority to reject teas, superior to the standard in all the requirements specified by law, such rejection would be an invasion of the rights of complainants, who, relying on the statute, have brought to this country teas which the statute advised them they could enter. This is no academic construction of a statute in advance of its application; we are dealing with a concrete case; the teas have been bought and brought here at large expense in reliance upon the statute; they have been once rejected, and unless the injunction be granted they will inevitably be again rejected, with the result that they must be removed from this country or destroyed. There is no ground for the contention that the application is premature, on the theory that non constat what is shown the board may finally admit the teas; the record establishes the converse of this proposition. Time will be saved and loss reduced by now enjoining a threatened injury, if the action which is threatened is without authority of law. Merritt v. Welsh, 104 U. S. 694, 26 L. Ed. 896; Philadelphia Company v. Stimson, 223 U. S. 605, 32 Sup. Ct. 340, 56 L. Ed. 570; Williams v. Molther, 198 Fed. 460, 117 C. C. A. 220; Vicksburg Waterworks Company v. Vicksburg, 185 U. S. 65, 22 Sup. Ct. 585, 46 L. Ed. 808.

[4] As to the so-called Read test, we do not think it necessary to discuss the question whether such a method of investigation may or may not be properly described as "chemical." To the board exclusively is left the determination of the question whether offered teas are equal to the standards in purity, quality, or fitness for consumption; whatever means they may adopt to satisfy themselves as to the degree of purity, of quality, or of fitness it would seem they may use. But in applying the information obtained by such use to the question, "Shall this tea be admitted or rejected?" they must follow the directions only of the statute and of such regulations as are not inconsistent with the statute. That they intend to follow the directions of regulations 22 and 23 is undisputed. In our opinion these regulations are inconsistent with the statute, because they undertake to direct the board to reject tea which contains any coloring matter, although the board may be convinced as the result of all the tests they apply that the coloring matter is present in such harmless quantities that the tea is not inferior

to the statutory standards in purity, quality, or fitness for consumption.

The decree is reversed, and cause remitted, with instructions to decree in conformity with this opinion.