## PAGE v. ARKANSAS NATURAL GAS CORPORATION.*
### No. 9102.
Circuit Court of Appeals, Eighth Circuit.
Oct. 5, 1931.

*Rehearing denied December 9, 1931.

See also (C. C. A.) 35 F.(2d) 462.

F. J. Looney and J. M. Grimmet, both of Shreveport, La. (Jordan Sellers, of El Dorado, Ark., Yandell Boatner, of Shreveport, La., McNalley & Sellers, of El Dorado, Ark., and Pugh, Grimmet & Boatner, of Shreveport, La., on the brief), for appellant.

Jeff Davis, of El Dorado, Ark., and J. Merrick Moore, of Little Rock, Ark. (C. W. Gray, of Little Rock, Ark., and Frueauff, Robinson & Sloan, of New York City, on the brief), for appellee.

Before KENYON and BOOTH, Circuit Judges, and DEWEY, District Judge.

KENYON, Circuit Judge.

This suit, brought in a state court of Arkansas and removed to the federal court, is one in which appellant, trustee of the Mike Lyvers Syndicate (herein called the Lyvers Syndicate), seeks a decree that the Arkansas Natural Gas Corporation et al., successor in interest to the Natural Gas & Petroleum Corporation, holds in trust for appellant, as trustee, a certain gas and oil lease on what is known as the Bilyou (or Bilyeu) tract, viz.: The northwest quarter of the northwest quarter of section 9, township 16 south, range 15, Union county, Ark. The Lyvers Syndicate was organized under the laws of Arkansas February 21, 1923, by a declaration of trust, in which Mike Lyvers was appointed trustee, with almost unlimited powers as to the management of the trust and its properties. Beneficial interests in the trust, to the extent of 14,400 units, were sold all over the United States at the price of $10 per unit. The lease in question is one made in 1922 by J. A. Bilyou and wife to one Olvey, assigned by him to one Murphy and by Murphy to Otto L. Morris, who made two assignments thereof to Mike Lyvers, trustee of the Mike Lyvers estate, which together covered the entire lease. The lease was incumbered by an agreement between Morris and his assignor, Murphy, by the terms of which Murphy was to have some $32,000 out of the first oil and gas produced from the lease. At the time of organization of the Lyvers Syndicate, there existed an organization with the impressive title, "Harry Morris Guaranteed Gusher Syndicate No. 3" (hereinafter termed the Gusher Syndicate), which had been promoted by Harry N. David and Otto Morris, who were also the promoters of the Mike Lyvers Syndicate. These two syndicates worked together, somewhat interrupted by various events, one being an indictment on September 13, 1923, of Mike Lyvers, Harry and Otto Morris, for conspiring to defraud the unit holders of the Mike Lyvers Syndicate, and for using the United States mails to carry out the same. On August 28, 1923, the Gusher Syndicate was placed in the hands of a receiver in the state court, and one Williford was appointed receiver. He endeavored to find the books of this and other syndicates controlled by the Morrises, but was unsuccessful, they having been removed from the offices the previous day. Williford demanded from Lyvers the property of the Lyvers Syndicate, and some of it was conveyed to him by Lyvers. Certain of the unit holders learning of Williford's plans to sell the property of the Lyvers Syndicate formed a reorganization committee, which engaged one Dr. McComb to act for them, who with other members of this committee filed an involuntary petition in bankruptcy against the Gusher Syndicate, and it was adjudged a bankrupt December 24, 1923. Harry N. Morris was adjudged a bankrupt thereafter. Both proceedings were referred to one Pope, referee in bankruptcy. H. M. Barney, who had in November, 1923, been receiver of the Gusher Syndicate, was in January, 1924, made trustee in bankruptcy. He had as receiver obtained possession of all the property of the Gusher Syndicate by the aid of the federal court. He was as unsuccessful as Williford in finding the books of the Mike Lyvers Syndicate, the Gusher Syndicate, or the Morris Drilling Company, which was another concern controlled by the Morrises and operating out of the same offices. Barney took actual possession of the various properties of the Gusher Syndicate and the producing leases of the Lyvers Syndicate, and as to the Bilyou lease, he put up placards on the property stating that it was in his possession as receiver of the federal court. He continued to hold this possession of all of these properties as property of the bankrupt until they were sold by him as trustee in March, 1925. In May, 1924, he paid the annual rental due on the Bilyou lease in the sum of $40. The reorganization committee under Dr. McComb became active after the adjudication of the Gusher Company as a bankrupt. A plan was formulated to organize a new corporation to purchase the properties held by the trustee in bankruptcy. Meetings of unit holders of the Lyvers Syndicate were held throughout the United States, at which they were informed that the properties of the Lyvers Syndicate had been taken over by the trustee in bankruptcy of the Gusher Syndicate. In January, 1924, the reorganization committee mailed to the unit holders a form of proof of claim in bankruptcy to be used by them in filing their claims as creditors in the matter of the Gusher Syndicate and Harry Morris, bankrupts. This committee organized the Moco Oil Corporation, the purpose of which was to acquire the Morris properties. The unit holders were constantly advised of the situation by the publication and distribution of a paper called "The Moco News." In one copy it listed properties which the Moco Oil Corporation intended to buy from the trustee in bankruptcy, and this list included the Bilyou lease. In February, 1924, Mike Lyvers filed an intervention before the referee in bankruptcy claiming certain property taken by the trustee in bankruptcy, among which was

the Bilyou lease. February 15, 1924, the trustee filed response, admitting possession of the property, and claiming it as trustee in bankruptcy, and denying ownership in Lyvers, and asking for a summary order directing Lyvers to execute a quitclaim deed conveying certain leases of the Lyvers Syndicate to him as trustee, alleging that said leases were purchased with moneys and assets of the bankrupt estate, and that they were held by Lyvers only as trustee for the benefit of said estate. The matter was heard by the referee, who held that Lyvers had no interest in this property and that all the property of the Gusher Syndicate and the Lyvers Syndicate belonged to a common fund. The District Court affirmed the order of the referee requiring Lyvers to convey the property in question to Barney, trustee, and on October 13, 1924, Lyvers personally and as trustee of the Lyvers Syndicate conveyed the same, which included the Bilyou lease, to Barney as trustee. The property in the Bilyou lease was erroneously described in the deed, but was afterwards corrected by a second quit claim deed by Lyvers as trustee of the syndicate to Barney, trustee in bankruptcy. In October, 1924, the referee in bankruptcy mailed to the unit holders of the Lyvers Syndicate a notification to file their claims in bankruptcy as creditors of the estate, and the unit holders, representing more than ten thousand units, filed claims in the Gusher Syndicate bankruptcy proceeding. These claims were allowed and a dividend of 2½ cents per unit was paid. January 23, 1925, Barney, as trustee in bankruptcy, made a contract with the Natural Gas & Petroleum Corporation to sell to it the properties remaining in his hands for $125,000. This was approved by the referee and duly recorded. At that time the Bilyou lease was unexplored. It was difficult to sell it separately because of the $32,000 oil payment to Murphy standing against it. The best offer which the referee had received was $100,000, and he had been authorized by the trustee to accept this. About a week after the contract between Barney as trustee and the Natural Gas & Petroleum Corporation was made, McComb caused a petition to be filed by the Moco Oil Corporation, in which it was alleged that it was willing to pay $155,000 for the properties. This attempt does not seem to have borne fruit or to have been seriously considered. After this the Natural Gas & Petroleum Corporation took over and operated the properties embraced in the contract. A deed of assignment of all these properties carrying out the contract of January 23, 1925, was ex-

ecuted by Barney as trustee to the Natural Gas & Petroleum Corporation on March 2, 1925, and the balance of purchase money was paid. The Bilyou lease was included in the properties conveyed. March 12, 1925, the purchaser entered on the Bilyou lease and drilled a gas well. As oil wells were drilled in the vicinity the value of the lease increased, and on March 12, 1925, it had a value of $6,000 above the $32,000 against it. The Natural Gas & Petroleum Corporation in buying these properties relied on its attorney's opinion as to title and assumed that it had a valid title. March 18, 1925, a petition was filed before Pope, referee, by unit holders, Zug, Wilson, and Turner, alleging they filed it for all unit holders as a class proceeding, and asking that the sale of the Bilyou lease be set aside on the ground that it was in fact the property of the Mike Lyvers Syndicate and not the property of the Gusher Syndicate or Harry N. Morris, bankrupts. Response was filed by the trustee, and the petition was denied. No review by the District Court was ever asked. The Bilyou lease continued to be developed by the purchaser, and a number of wells were drilled. The peak of production was reached on May 10, 1925, when the lease was producing 40,000 barrels of oil per day of twenty-four hours, and the gas well was producing much gas. The Bilyou lease had come into its own, and was of great value, estimated as of May 10, 1925, to be $600,000 to $800,000. In its development the purchaser paid for the period from March 1, 1925, to January 1, 1928, a total of $221,554.33. Under the terms of the trust Lyvers could choose his successor. It was natural that McComb and others having the welfare of the unit holders at heart should desire a new trustee, as according to Williford's testimony Lyvers "seemed more worried about keeping out of the penitentiary than anything else." Lyvers would not appoint McComb as his successor, but did appoint John H. Page appellant here, who filed suit against the Natural Gas & Fuel Company, successor of the Natural Gas & Petroleum Corporation, in the District Court of the Eastern District of Arkansas, which suit was similar to the one at bar. Judge Trieber dismissed it on April 18, 1927, for lack of jurisdiction. December 20, 1927, this suit was brought against the Natural Gas & Fuel Corporation in the state court and removed to the United States District Court. The trial court dismissed the bill for failure to set out a cause of action. The case was appealed to this court and the decree of the district court was reversed and the case remanded. Page

et al. v. Natural Gas & Fuel Co., 35 F.(2d) 462. Appellee having succeeded to the rights of the Natural Gas & Fuel Company was substituted as defendant and filed answer pleading many defenses. The trial court at the present trial rendered an extended opinion dealing with every phase of the case and made certain findings of fact and conclusions of law. It held that the previous decision of this court was not binding on certain points as there was voluminous evidence introduced not in the prior hearing. The court concluded that the order on Lyvers to convey the Bilyou lease to the trustee and the deed carrying out the order vested title in Barney as trustee, from whom title passed to the predecessor of appellee, and that the question of title was res adjudicata. Further, that the order of the referee on the petition of Zug et al. was res adjudicata on the question of title and that laches would prevent plaintiff from recovering. The suit was dismissed for want of equity.

We have tried to make as brief a statement of the important facts as is compatible with a fair understanding of a very complicated and involved situation.

We shall not discuss the question as to whether the petition of intervention filed by Zug et al. and the proceedings thereon amounted, as found by the trial court, to res adjudicata on the question of title to the Bilyou lease, nor shall we place our decision upon the ground of laches, which defense was sustained by the District Court. This court has taken the position that where the subject of controversy is mining and oil property, the doctrine of laches should be rigidly enforced if necessary to prevent injustice, Taylor v. Salt Creek Co., 285 F. 532, and the Supreme Court has indicated in Patterson v. Hewitt, 195 U. S. 309, 25 S. Ct. 35, 49 L. Ed. 214, that there is no class of cases in which the doctrine has been more relentlessly enforced, yet we have doubt as to whether it should be applied in this case where delays were to a large extent caused by a faithless trustee failing to take action to correct his own wrongful conduct. Willard v. Campbell et al., 77 Mont. 30, 248 P. 219. As the trial court's decision must be upheld on the ground that the intervention of Lyvers in the bankruptcy proceeding, and the action of the referee and court thereon, constituted res adjudicata as to the ownership of the Bilyou lease, there is no need of deciding the question of laches. We are of the opinion also that the Gusher Syndicate and the Lyvers Syndicate were completely merged prior to bankruptcy, and that the leases secured by the Lyvers Syndicate passed as a matter of law to the trustee in bankruptcy of the Gusher Syndicate.

Are we foreclosed from considering these questions by the prior decision of this court?

The rule of "the law of the case" is of course recognized by this court. The theory is that what has once been determined should not be reopened, well expressed by Mr. Justice Holmes in Messinger v. Anderson, 225 U. S. 436, 32 S. Ct. 739, 740, 56 L. Ed. 1152: "In the absence of statute the phrase, 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." City and County of Denver v. Denver Tramway Corp. (C. C. A.) 23 F.(2d) 287; Federal Reserve Bank of Kansas City, Mo., v. Omaha Nat. Bank (C. C. A.) 45 F.(2d) 511; Dodd v. Union Indemnity Co. (C. C. A.) 32 F.(2d) 512.

In the former trial the complaint was dismissed upon motion for the reason that it did not state a cause of action. The truth of the allegations was therefore admitted for the purposes of the motion. This court in its opinion was considering whether the complaint stated a cause of action. No evidence was introduced in the first trial unless the exhibits to the complaint could be considered as such. The complaint did not show that Lyvers was appearing in the intervention in any but his individual capacity. Therefore the court held the order adjudicating title against him did not bind him as trustee. The evidence introduced on the present trial shows that Lyvers never held the property in question as an individual or in any capacity except as trustee. It throws a different light on his appearance in the intervention proceeding. At the present trial the response and the petition for summary order filed in the intervention was introduced. That was not in the former trial. The District Court in its opinion stated, "It appears from the testimony that the only title that Lyvers had was that acquired through two conveyances to him by Otto L. Morris." Further, "The testimony clearly shows that Barney as Trustee in Bankruptcy had no possession of any property belonging to Mike Lyvers individually." These statements are justified by the evidence. It is apparent that the evidence introduced here makes a case materially different from that appearing on the face of the complaint; therefore as to the questions we propose to discuss we are in our judgment

not bound by the former decision. Meyer & Chapman State Bank v. First Nat. Bank of Cody (C. C. A.) 291 F. 42. It is to be noted also that the former opinion passes the question of the jurisdiction of the referee to make the summary order on Lyvers, which would leave in any event that question and the legitimate conclusions which should follow its solution entirely open to this court.

Was the intervention by Lyvers in the bankruptcy proceeding and the determination by the referee in bankruptcy and the District Court as to the ownership of the lease in question res adjudicata as to such issue involved in this case?

In February, 1924, Mike Lyvers filed in the matter of the bankruptcy proceeding of the Guaranteed Gusher Syndicate No. 3, Harry Morris, Trustee, a petition asking that the trustee be ordered by the Court or the referee not to sell any of the properties claimed in said petition. He asserted therein that Barney, trustee of the bankrupt estate, had taken possession of and was claiming certain individual property of said Mike Lyvers as property of the bankrupt estate. A lease of all properties claimed by Lyvers was attached as "Exhibit A," which exhibit covers the lease known as the Bilyou lease in controversy here, and said exhibit also recites, "And any other properties recorded in Mike Lyvers Syndicate and Mike Lyvers, Trustee in Union and Ouachita Counties, Arkansas."

Barney, trustee, filed response to the intervention of Lyvers, denying that Lyvers was the owner of the oil and gas leases or had any interest therein whatsoever. He also filed a petition for an order requiring Lyvers to execute a quitclaim deed to the trustee of the bankrupt estate conveying certain oil and gas leases, among them the Bilyou lease, and alleged:

"That said oil and gas leases were purchased with the properties, moneys and assets of said bankrupt estate, and that said leases were taken in the name of Mike Lyvers, but that the said Mike Lyvers only took and held as trustee for the benefit of said trust estate, the bankrupt herein.

"That the said Mike Lyvers did not pay out and had no funds with which to pay for said lease, but that he at said times was in the employ of Harry Morris as trustee under the declaration of trust of the assets of this bankrupt estate, and that in placing and taking said leases in the name of said Mike Lyvers that the same was done under a breach of trust of said Harry N. Morris under his declaration of trust agreement. That the said Mike Lyvers does not now and has not at any time owned any interest in said leases, and that your trustee is entitled to an order out of this court directing him to execute a quit claim deed to said leases to said trustee in bankruptcy, a copy of which deed is hereto attached and submitted to this court for its approval. * * *

"That the said Mike Lyvers had filed an intervention herein for said oil and gas leases and has voluntarily submitted himself to the jurisdiction of this court, and is now subject to the orders of this court."

The referee in bankruptcy held that title to the properties claimed by Lyvers and Otto L. Morris had vested in the trustee in bankruptcy, and Lyvers was ordered to execute conveyances transferring the legal title to the properties held by him as set forth in the petition of intervention of the trustee in bankruptcy, H. M. Barney. The referee in his order said: "All of the property claimed by the interveners was purchased with the funds of the bankrupt, derived from the sale of units in the trust estate of Harry Morris Guaranteed Gusher Syndicate No. 3, the bankrupt herein, and that the title to the various properties, including the property intervened for and more particularly set out in the various assignments introduced in evidence, was taken in the name of Mike Lyvers, and Otto L. Morris, and also in the name of Mike Lyvers, Trustee in Bankruptcy herein. All of said property was merely held by said parties for the benefit of the bankrupt and they had no interest in same otherwise. They not only handled these properties in this manner but handled other properties in like manner and in the name of various syndicates for their own convenience. All of the properties belonged to a common fund, although badly commingled and hard to trace owing to the absence of the books of the various syndicates including those of the bankrupt; and also because the interveners have failed and refused to appear before the referee and testify." The order of the referee was affirmed by the trial court, which found that the referee had jurisdiction to make an order upon Mike Lyvers to transfer the property held by him and described in his petition of intervention.

October 13, 1924, Mike Lyvers, for himself, for the Mike Lyvers Syndicate, and for Mike Lyvers, trustee, made a quitclaim deed to Barney, trustee in bankruptcy, of the Gusher Syndicate, which covered the Bilyou lease, and which recited that it was his "intention to convey all interest appearing in my

name, individually and as trustee of the Mike Lyvers Syndicate, and as Mike Lyvers, trustee, wherever situated," etc., and "that all properties appearing in my name in the State of Arkansas, were in truth and in fact purchased with the funds of the Harry Morris Guaranteed Gusher Syndicate No. 3, and said properties were placed in my name for convenience only, and are in truth and in fact the properties of the Harry Morris Guaranteed Gusher Syndicate No. 3."

Appellant claims that this conveyance was a voluntary act, and that Lyvers could not give away property held by him as trustee. It does not seem to have been a voluntary act. The court's order was in part as follows: "The court finds as a matter of law that the said Referee did have such jurisdiction. It is therefore by the court considered, ordered and adjudged that the order of the Referee requiring Mike Lyvers to convey to H. M. Barney, Trustee of the Harry Morris Guaranteed Gusher Syndicate No. 3, Bankrupt, by a quit claim deed for all of the property described in the intervention of said Mike Lyvers be affirmed." In making the quitclaim deed Lyvers was merely carrying out the order of the referee and the court. Later a quitclaim deed was executed to cover a mistake of description in the first deed.

Was there jurisdiction in the referee and the District Court to make the orders on Lyvers to transfer the property described in the petition of intervention to the trustee in bankruptcy of the Gusher Syndicate? Could the question of title to the leases be determined in a summary proceeding in a bankruptcy court, or must it be by a plenary suit?

The significance of possession with reference to jurisdiction in a bankruptcy court to determine questions of title by summary, as distinguished from plenary, proceedings has received much attention by the courts and text-books writers. 5 Remington on Bankruptcy (3d Ed.) § 2365, p. 448, says: "So far as concerns personal jurisdiction over the bankrupt, the bankruptcy court, as we have already seen, assumes jurisdiction by the filing of the bankruptcy petition. So far as concerns jurisdiction over property, the actual or constructive possession, after the filing of the bankruptcy petition, by the bankruptcy receiver, trustee, marshal, or referee, or by the bankrupt or his agents, or by someone not claiming beneficial interest (as, for example, custodians and court officers holding under nullified liens by legal proceedings, etc.) constitutes 'custodia legis' for the purpose of 'assumption of jurisdic-

tion' by the bankruptcy court. And the bankruptcy court 'assumes jurisdiction' over 'property,' and· the property comes into its 'custodia legis,' if, after the filing of the bankruptcy petition, it is in the custody or control of the receiver in bankruptcy, or of the trustee, marshal, referee, bankrupt, bankrupt's agent, or of someone not claiming beneficial interest, such as custodians or court officers under nullified liens by legal proceedings." In Murphy v. John Hofman Co., 211 U. S. 562, 568, 29 S. Ct. 154, 156, 53 L. Ed. 327, the court says: "But, where the property in dispute is in the actual possession of the court of bankruptcy, there comes into play another principle, not peculiar to courts of bankruptcy, but applicable to all courts, Federal or state. Where a court of competent jurisdiction has taken property into its possession, through its officers, the property is thereby withdrawn from the jurisdiction of all other courts. The court, having possession of the property, has an ancillary jurisdiction to hear and determine all questions respecting the title, possession, or control of the property. In the courts of the United States this ancillary jurisdiction may be exercised, though it is not authorized by any statute. The jurisdiction in such cases arises out of the possession of the property, and is exclusive of the jurisdiction of all other courts, although otherwise the controversy would be cognizable in them." In Emerson v. Castor (C. C. A.) 236 F. 29, 37, the court says: "When, therefore, an ancillary tribunal ·takes possession, whether with or without opposition, such possession draws to that tribunal power, indeed, imposes a duty, to determine all questions of priorities and liens affecting the property." In Re Hoover-McClintock Motor Car Co. (D. C.) 1 F.(2d) 660, 661, it was said: "Possession of any material part of the res gave the referee jurisdiction to determine the validity of the deed of trust affecting such property." In Re Rathman, 183 F. 913, 914, this court said: "The jurisdiction of the bankruptcy court to determine in a summary proceeding adverse claims created before the filing of the petition in bankruptcy to liens upon and titles to property claimed by the trustee as that of the bankrupt is conditioned and limited by its actual possession thereof." In Re Rochford et al., 124 F. 182, this court had before it the question of jurisdiction of the District Court sitting in bankruptcy over a controversy between trustees in bankruptcy and an adverse claimant relating to the title or possession of property in the custody of the latter and held that in the absence of the

adverse claimant's consent there was no jurisdiction. It held that such court had jurisdiction, after reasonable notice to claimants to present claims, to determine the claims of all parties to property which its officers had lawfully reduced to actual possession in the course of the administration of the estate of the bankrupt. To the same effect is Clay v. Waters (C. C. A.) 178 F. 385, 21 Ann. Cas. 897; Shea v. Lewis (C. C. A.) 206 F. 877; In re McMahon (C. C. A.) 147 F. 684, 685; In re Lipman (D. C.) 201 F. 169.

This court in its former opinion, referring to the serious question as to jurisdiction on the part of the referee to make the summary order on Lyvers, referred to May v. Henderson, 268 U. S. 111, 45 S. Ct. 456, 69 L. Ed. 870, and Harrison v. Chamberlin, 271 U. S. 191, 46 S. Ct. 467, 70 L. Ed. 897. In May v. Henderson, page 115 of 268 U. S., 45 S. Ct. 456, 458, the court said: "It is well settled that property or money held adversely to the bankrupt can only be recovered in a plenary suit and not by a summary proceeding in a bankruptcy court." There the property was held by the assignee of the bankrupt and it was held the trustee in bankruptcy could recover it in a summary proceeding. In Harrison v. Chamberlin the property was in possession of the adverse claimant, and the court said, page 193 of 271 U. S., 46 S. Ct. 467, 468: "It is well settled that a court of bankruptcy is without jurisdiction to adjudicate in a summary proceeding a controversy in reference to property held adversely to the bankrupt estate, without the consent of the adverse claimant; but resort must be had by the trustee to a plenary suit." Neither of these cases is applicable to the situation here, for the party claiming to hold adversely in the present case brought the action in intervention and consented thereby to the jurisdiction.

The possession referred to in the authorities to confer jurisdiction may be actual or constructive. O'Dell v. Boyden (C. C. A.) 150 F. 731, 10 Ann. Cas. 239; In re Cochran et al. (D. C.) 40 F.(2d) 282; In re Jones (D. C.) 42 F.(2d) 269. O'Dell v. Boyden and In re Cochran, supra, were cases where a seat on the stock exchange was held to be constructively in possession of the bankruptcy court, even though the approval of the board of directors of the exchange was necessary to a transfer of the seat. In the Cochran Case (D. C.) 40 F.(2d) 282, 284, the court said: "The possession may have been constructive and not manual, but it was only because it was not capable of more

tangible custody, and it was an adjudication not in posesssion of adverse claimant, and the jurisdiction of the bankruptcy court attached." These various authorities abundantly support the proposition that a referee in bankruptcy has no jurisdiction to make a summary order determining title to property claimed to belong to the bankrupt estate and which is not in such possession of the bankruptcy court as to constitute "custodia legis" but is held by an adverse claimant, unless such adverse claimant consents to jurisdiction.

The procedure adopted is not important if such possession of the property in controversy exists. This court held in Galbraith v. Robson-Hilliard Co., 216 F. 842, that if the court had possession of the property it could adopt any procedure that constituted due process of law and that a summary procedure was due process. So the queries arising here are: (a) Was there actual or constructive possession of the property by the bankruptcy court? (b) If not, did the Lyvers Syndicate, through Lyvers as trustee, consent to jurisdiction?

■■■■ Appellant insists that the trustee in bankruptcy had no possession of the property covered by the Bilyou lease. Prior to bankruptcy proceedings against the Gusher Syndicate, Williford as receiver in the state court had taken physical possession of some of the producing properties of the Mike Lyvers Syndicate. The Bilyou lease was vacant property. The trustee never undertook to drill wells thereon, and it is true that the oil and gas under the lease could not have been reduced to actual possession except by drilling, but he went upon the property, put up notices that it was in his possession as receiver and trustee in bankruptcy, warned other persons off, and was certainly executing such dominion over the lease as it was possible to do without drilling. There could be no question as to possession of the properties in the name of the Lyvers Syndicate actually being operated, such as the Johnette and Mullins leases. During the period of bankruptcy administration and up to the time the property was conveyed to the Natural Gas & Petroleum Corporation, the trustee continued to assert possession of the producing and nonproducing properties in the name of Mike Lyvers as trustee, and paid the annual rental of $40 due on the Bilyou lease in order to preserve it as an asset of the bankrupt estate. No one else seemed to have enough interest in it to do this. The unit holders quite generally recognized this possession.

Appellant refers to Midkiff v. Colton (C. C. A.) 252 F. 420, 424, which holds that, "Adverse possession of the minerals could have been started only by actual working of them or some other act of dominion over them showing assertion of title and use in accordance therewith." That case, however, involved the question of actual possession or user being sufficient to create rights by adverse possession. It is not the same question as the assertion of dominion necessary to constitute "custodia legis" in a bankruptcy court. In 6 Corpus Juris, § 432, p. 228, it is said: "Where property is incapable or difficult of manual delivery, the officer may not be required to take actual possession thereof; but some notorious act as nearly equivalent to actual seizure as practical must be substituted, and such steps taken as will fasten the property in the hands of the person who has possession or control, to await the judgment in the case, or such person must be required to place it in the hands of the court."

The trial court made a finding of fact that the forty-acre tract of land covered by the Bilyou lease was taken possession of by Barney in November, 1923, as receiver in the United States District Court in a suit in bankruptcy against the Harry Morris Guaranteed Gusher Syndicate No. 3, in which Barney was afterwards elected trustee. There was substantial evidence to support such finding. In our judgment there was such possession of the property covered by the Bilyou lease as to constitute "custodia legis" and give jurisdiction to the bankruptcy court to determine in a summary proceeding the question of title thereto. However, if there was not such possession it would not defeat jurisdiction, as it appears that the adverse claimant brought the proceedings in intervention and invited the bankruptcy court to act, thereby consenting to its jurisdiction. In 5 Remington on Bankruptcy, § 2195, p. 280, it is said: "Jurisdiction may be conferred on the bankruptcy court by the defendant's consent, in cases where otherwise it has no jurisdiction, and if adverse claimants in possession of the property who would otherwise not be within the jurisdiction of the bankruptcy court, nevertheless voluntarily surrender custody of the property, or consent to the jurisdiction of the bankruptcy court, then the question of ownership and all other questions in relation thereto, as, for instance, the extent, validity and priority of liens upon and interests in the property, may be tried out in the bankruptcy proceedings." And at page 284: "Thus, also, an adverse claimant confers jurisdiction by consent when he comes into the bankruptcy court and asks for the surrender of property, or for the declaration of a lien thereon, where the property is in the custody of a trustee in another state." And at page 287: "The appearance in the bankruptcy proceedings and, without objection to the jurisdiction, the submission of the questions of ownership or of priority to the referee for adjudication, amount to consent." It was held in Taubel-Scott-Kitzmiller v. Fox, 264 U. S. 426, 44 S. Ct. 396, 398, 68 L. Ed. 770, that Congress had not provided "that a substantial adverse claim to property which is not in the possession of the bankruptcy court, and which is demanded by the trustee under subdivision 'f' of section 67 [11 USCA § 107, subd. f], may be litigated, without consent, by a summary proceeding." This court in Wells & Co. v. Sharp, 208 F. 393, held that consent of adverse party would confer jurisdiction on the bankruptcy court.

██ Further, no objection to the form of proceeding appears to have been taken until too late. The adverse party came into the bankruptcy proceeding and asked to have the ownership of the Bilyou lease and other leases determined, and after the referee had made his order on March 6, 1924, determining such ownership, Lyvers excepted on March 13, 1924, to the jurisdiction of the referee to hear and determine the issue in a summary proceeding. There had been no insistence on a plenary proceeding and no objection to a summary proceeding until after the referee had rendered his decision. In re Hopkins (C. C. A.) 229 F. 378, 380, the court said: "The question was presented to the trustee whether he would proceed summarily or by a plenary suit and he elected the former without objection by the bankrupt, his wife or any one else. Having proceeded without objection we think it is too late now to present a question which is addressed solely to the form of the proceeding. If the objection had been made at the time the trustee was required to elect, it is quite possible that the petitioner's contention would have been sustained, but she, apparently, acquiesced in the summary proceeding as the most satisfactory way of disposing of the question and we are of the opinion that it is too late to present the question on this review by an appellate court."

A bankruptcy court has the power in the first instance to determine the existence of the conditions upon which its right to proceed depends. Taubel-Scott-Kitzmiller Co. v. Fox, 264 U. S. 426, 44 S. Ct. 396, 68 L. Ed. 770. In Priest v. Weaver, 43 F.(2d) 57, 59, this

court held that the bankruptcy court had jurisdiction to determine whether it had possession of the property actual or constructive, and that: "If it had possession, it could determine in a summary proceeding, controversies involving substantial adverse claims thereto; but if it lacked possession, it could not, in a summary proceeding, adjudicate the validity of a substantial adverse claim."

We are satisfied that the bankruptcy court had jurisdiction to try in a summary proceeding the question of title to the Bilyou lease raised by the Lyvers intervention on the grounds: (a) That it had possession in the sense of "custodia legis" of the property involved, or (b) that Lyvers consented to its jurisdiction, and did not object to the summary form of the proceeding until the referee had made his order.

That Lyvers attempted to withdraw his intervention is not important, as the counter petition had been filed asking affirmative relief, and it was too late then to withdraw. Ex parte Skinner & Eddy Corporation, 265 U. S. 86, 44 S. Ct. 446, 68 L. Ed. 912; Greenville Banking & Trust Co. et al. v. Selcow et al. (C. C. A.) 25 F.(2d) 78. Scholl Mfg. Co. v. Rodgers, Trustee, 51 F.(2d) 971 (opinion this court, filed August 10, 1931), is not an authority to the contrary.

The controlling point in this case is whether Lyvers was bound as trustee of the Lyvers estate or only as an individual by the proceedings in the bankruptcy court. Appellant claims that the record before the court in the present appeal as to this question is identical with that in the former one, and therefore the holding there as to the order on Lyvers that "it was not an adjudication against him as trustee and it does not estop the plaintiffs as successor trustee to maintain this bill," settles the question as it becomes the law of the case. We have before pointed out that the situation presented in the present hearing was not the same as in the former where the entire case rested on the allegations of the complaint. Here there was additional evidence bearing upon whether Mike Lyvers intervened on behalf of the estate as trustee or as an individual. The trial court held there was no distinction between Lyvers as an individual and as a trustee under the record of this case; that Lyvers' identity remained unchanged. We have heretofore pointed out that the order of the trial court upon Lyvers was not to convey merely property owned by him personally, but to convey all of the property *described in the intervention,* which covered property

held by the Lyvers Syndicate and by Mike Lyvers as trustee. It is true that Lyvers' petition of intervention refers to Barney, trustee, holding possession of *individual* property of his. This might be accounted for by section 1, article 10, of the trust declaration, which is as follows: "The trustee of this trust estate shall be self perpetuating and as such trustee shall own in his own name the legal title to the corpus of the trust and shall have the absolute management and control of the whole and entire res or corpus, both in present and future, including the power of sale, pledging, mortgaging, bonding and the incumbrancing in any manner or form whatsoever, together with the absolute power of alienation, substitution and distribution as in these articles provided." Under this article, Lyvers could hold the property of the syndicate in his own name and could appear without joining the unit holders. He was trustee of an express trust. This court has held in Mathis v. Hemingway, 24 F.(2d) 951, that such trustee could sue in his own name without joining with him the party for whose benefit action was brought. Kerrison, Assignee v. Stewart et al., 93 U. S. 155, 23 L. Ed. 843.

Of course Lyvers might have owned other oil properties in which the syndicate had no interest, but the record shows that as to the Bilyou lease he had no title whatever except as trustee. The court properly considered that the right to all the properties set forth in Exhibit A to Lyvers' complaint was in controversy. The Bilyou lease was included therein. Lyvers had no difficulty in understanding what the order to convey meant, as he made deed to the trustee in bankruptcy in pursuance of the order of the referee, affirmed by the court, and made it individually and as trustee of the Lyvers Syndicate. Whatever interest he had in the Bilyou lease in any capacity whatever was put in issue by the response of Barney to his petition denying that Lyvers had any interest whatever in the leases and that all beneficial interest therein was in the Gusher Syndicate. He also asserted that the oil and gas leases held by Lyvers were purchased with the moneys and assets of the bankrupt estate, and that Lyvers held them as trustee for the benefit of said estate, and that he was a mere employee of Harry Morris as trustee. This certainly amounted to a declaration that there was no beneficial interest in the property in the Lyvers Syndicate. The issue was clearly drawn, a trial was had, evidence was introduced, and a decision rendered. Surely the court was not engaged in the useless procedure of trying title to the

Bilyou lease as between Lyvers as an individual and the bankrupt estate. The proceeding in intervention was prosecuted by him in his representative, and in none other, capacity. Otherwise the referee and the court were engaged in a farcical performance in passing on title as to the lease between Lyvers individually and the bankrupt estate when Lyvers never had, or claimed to have, any individual title to the leases of the Lyvers. Syndicate, and when the record shows that all the title he had was as trustee. In the case of Linton v. Omaha Wholesale Produce Market House Co., 218 F. 331, 335, this court said: "It is contended by appellant's counsel that, as Adolphus F. Linton was not impleaded in the Becker suit as trustee, but as an individual, in his own right, he cannot be estopped from prosecuting this suit, in which he appears in his capacity as trustee for his children, by the judgment rendered against him in that suit. Here, too, we think the assumption is unfounded. It is true he was not designated in the caption of the Becker suit as a trustee, but averments are found throughout the bill in that suit which most clearly disclose that he was there charged with making a claim to the lots in question solely as trustee for his children. It is quite common and altogether proper to describe the capacity of a named defendant or his relationship to other parties in the body of the bill, without disclosing them in the style of the action at all. Not only so, but the defendants in the Becker case pleaded affirmatively that Mr. Linton held title to the lots in question for his children, and the case was tried on that issue. That issue was, therefore, not only made, but fully tried, in the Becker suit." In 34 Corpus Juris, § 418, p. 998, it is said: "A party is not bound by a former judgment where he sued or defended in the one action in his individual capacity and in the other in a representative character, as guardian or next friend, executor or administrator, trustee for others, attorney in fact, assignee in bankruptcy or insolvency, receiver, or member of a corporate board, unless in any of these instances he was made a party to the first action in both capacities, or the scope of the litigation was such that all his rights or interests, held in any of his capacities, were before the court and involved in its decision." In Williams v. Southern Pacific Co., 54 Cal. App. 571, 202 P. 356, 359, the rule is stated: "Without multiplying authorities, it may be stated as a general rule that, where one appears in a representative capacity in one action and in his individual capacity in another action, involving the same subject-matter,

without any change in his relation to that subject-matter, a judgment in the one case is conclusive of his rights in the other." All the rights or interests that Lyvers had were before the referee, and the proceeding there holding that Lyvers had no interest in these leases, affirmed by the District Court, constitutes res adjudicata on the question of title to the Bilyou lease as between the Lyvers Syndicate and the predecessor of appellee, which acquired the title held by the bankrupt estate. As the proceedings were binding on Lyvers as trustee, they are binding upon his successor, and prevent the relief asked by him in this suit. In both cases there was the same claim, the same demand, the same parties or privies.

The interesting contention is made by appellee, which was not passed on in the former trial, that the properties of the Lyvers Syndicate had by merger passed into the ownership and control of the Gusher Syndicate and that creditors of that Syndicate could have subjected the leases held in the name of Mike Lyvers as trustee to the payment of their claims. These syndicates are somewhat peculiar. They are not corporations, nor are they exactly in the nature of partnerships, but are rather closely akin to them. They are common law business trusts, and are subject to a more or less independent control or management, vested generally in a trustee. Questions have arisen in the various states where these syndicates are common as to their status. The Kansas decisions, in which reference is made to them, hold that such trusts validly created in other states are "foreign corporations" for service of process and blue sky law proceedings. Harris v. U. S. Mexico Oil Co., 110 Kan. 532, 204 P. 754; Home Lumber Co. v. Hopkins, 107 Kan. 153, 190 P. 601, 10 A. L. R. 879; Hamilton v. Young, 116 Kan. 128, 225 P. 1045, 35 A. L. R. 496. In the latter case the court refers to such syndicate as a legal entity distinct from the persons who compose it. This status has been questioned in tax matters arising under the federal revenue acts, and it has been held that they may be partnerships under state laws but are corporations within the definition of the Revenue Act of 1918 (section 1, 40 Stat. 1057). Burk-Waggoner Oil Ass'n v. Hopkins, Collector, 269 U. S. 110, 46 S. Ct. 48, 70 L. Ed. 183; Hecht v. Malley, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949. In Hemphill v. Orloff, 277 U. S. 537, 48 S. Ct. 577, 72 L. Ed. 978, it was held that a common-law trust created in one state might be forbidden to do business in another until

it had obtained the license required of foreign corporations and associations in general. These cases show there is an analogy between corporations and such common-law trusts. We have found no cases dealing with the question of merger of common-law trusts, but in the case of corporations it has often been held that a common control and management in a situation where a parent corporation has organized one or more subsidiaries results in what may be properly called an implied merger, which has been defined as a "confusion of rights." In some of these the parent corporation has been held liable for the tort of the subsidiary. Davis v. Alexander, 269 U. S. 114, 46 S. Ct. 34, 70 L. Ed. 186; Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; Lehigh Valley R. Co. v. Delachesa (C. C. A.) 145 F. 617; Costan v. Manila Electric Co. (C. C. A.) 24 F.(2d) 383. That the fiction of corporation entity may be disregarded if the corporation is so organized, operated, and controlled that it is a mere instrumentality of another corporation, is well established.

■ If the Lyvers Syndicate and the Gusher Syndicate were corporations, we should have little difficulty in concluding that in their inter-relationship and the common control and direction thereof, as shown by the evidence, the situation was such as to show that they had impliedly merged, and that both should be administered in the same bankruptcy proceeding. In re Watertown Paper Co. (C. C. A.) 169 F. 252, 256, the court stated: "(1) The legal fiction of distinct corporate existence will be disregarded, when necessary to circumvent fraud. (2) It may also be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality or adjunct of another corporation." Macy v. Browne (C. C. A.) 224 F. 359, 363; Majestic Co. v. Orpheum Circuit (C. C. A.) 21 F.(2d) 720; Hamilton Ridge Lumber Sales Corp. v. Wilson et al. (C. C. A.) 25 F.(2d) 592; Industrial Research Corp. v. General Motors Corp. (D. C.) 29 F. (2d) 623. In Edward Finch Co. v. Robie, 12 F.(2d) 360, 362, this court said: "Courts do not hesitate to look through the shell of corporate identity to get at the real purpose of the association of individuals." There can be no doubt that both the Gusher Syndicate and the Lyvers Syndicate were mere instrumentalities of the Morrises. There was complete identity of control and management, and this is generally the main test as to disregarding corporate entity. Why should not the same test apply to common-law trusts?

It would seem that to do complete justice the administration of the assets of the Lyvers Syndicate should be carried on in connection with the bankruptcy administration of the Gusher Syndicate. Their assets were intermingled, their accounts were confused, and their affairs were completely scrambled. All the books of these syndicates appear to have conveniently disappeared. Credit for carrying on the operations of the Lyvers Syndicate was extended either to the Gusher Syndicate or to the Morrises. Bills for the operation of the producing properties in the name of Mike Lyvers, trustee, were paid by checks of the Gusher Syndicate and of the Morris Drilling Company. Some reimbursements were made by the Lyvers Syndicate to the Gusher Syndicate or the Morrises for expenses incurred. However, the checks therefor were drawn by the Morrises themselves. The evidence shows that from the time the Lyvers Syndicate was created its moneys and properties were administered by the Morrises in connection with their administration of the affairs of the Gusher Syndicate. Lyvers as trustee had no credit extended to him—he was merely a straw man. In his testimony taken on intervention at an earlier date when he was claiming salary he testified that he was a mere employee of the Morrises, and that the Lyvers Syndicate and the Gusher Syndicate were operated as one organization, that he had no interest whatever in the property of the Lyvers Syndicate; and the testimony of Barney was that Lyvers disclaimed to him any ownership or interest in the property. Lyvers testified that the property, referring to that owned by the Mike Lyvers Syndicate, was really owned by the Harry Morris Guaranteed Gusher Syndicate No. 3; that he was trustee in name only, and that Harry Morris handled the business.

We have referred before to the almost complete acquiescence by the unit holders in the administration of the Lyvers property as part of the bankrupt estate. The bankruptcy proceedings as to the Gusher Syndicate were started by Dr. McComb representing unit holders of both syndicates. The unit holders were advised early in 1924 that the properties of both syndicates were being administered by the bankruptcy court, and two-thirds of the unit holders of the Lyvers Syndicate filed claims in the bankruptcy proceedings of the Gusher Syndicate as creditors thereof. Article 18 of the trust declaration,

which is as follows, bears on this question: "Sec. 1. The trustee herein named and all successors trustee may in his discretion terminate this trust by merger or reorganization in any manner or form whatsoever, and nothing herein shall be deemed to construe as a limitation or restriction upon such power or authority of the trustee, likewise the trustee may in his discretion alter, amend or abrogate any part or all of this trust agreement, as in his discretion he shall deem best in the conduct, management and control of this estate, to the best interests of the cestuis que trustent." The trustee is given the right under this article to terminate the trust by merger *in any manner or form whatsoever,* and nothing is to be construed as a limitation upon his power in that respect. No formal proceedings are necessary and if the conduct of the trustee is such that the result is to unite the trust with another trust we see no reason why this article is not sufficient to cover that situation and permit a court to say that Lyvers had merged his syndicate with the Gusher Syndicate. He turned over all power of control and management of the Lyvers Syndicate to the Morrises; he gave one of them authority to issue checks; he allowed, if he did not actively assist in, intermingling the property of the two trusts and confusing their affairs so that they could not be unscrambled. This would seem to constitute merger "in any manner or form whatsoever," as provided by the declaration of trust. There is no question that the trusts were operated as a unit. We see no reason why the separate legal entity of a business trust cannot be merged in another business trust and such separate entity be disregarded in a case of this kind the same as it would be if these syndicates were corporations. This merger took place before the adjudication in bankruptcy, and we think the Bilyou lease, in equity at least, became a part of the Gusher Syndicate's property prior to the adjudication in bankruptcy and hence passed to the trustee upon such adjudication. The trustee in bankruptcy took possession of the assets of the Lyvers estate and liquidated them the same as he did the property of the Gusher Syndicate. The referee in bankruptcy paid the debts of Lyvers, trustee, upon an equal basis with the debts of the Gusher Syndicate.

Appellant asserts that the equities of the situation are with him, while appellee insists they are with it. It is urged by appellant that the trial court's decision results in great injustice to the beneficial owners of the Lyvers Syndicate. On the other hand, appellee calls attention to the large amount paid in developing the property and the injustice of the unit holders of the Lyvers Syndicate profiting thereby. We do not think the equities overbalance in favor of appellant. It is true that the owners of the units in the Lyvers Syndicate have undoubtedly been swindled by the operations of Lyvers and the Morrises. Persons who buy units in a trust which confers such powers upon the trustee, as the trust articles did here, may reasonably expect trouble, and it is strange that anyone can be found to purchase units in such a trust where absolute power was given to Lyvers not only to carry on the business and to merge the trust or dispose of its property as he chose, but also to transmit his power to a successor selected by him. The equities of the creditors of both syndicates and the equities of appellee's predecessor in title were we think much stronger than the equities of the beneficial owners of the Lyvers Syndicate. There is no claim that appellee's predecessor was guilty of any fraud or wrongdoing. It purchased the property from the trustee in bankruptcy relying on the opinion of its attorney that the title was good. There has been expended by appellee and its predecessors over $200,000 in developing the Bilyou lease. Title had been held to be in the trustee by the referee and by the District Court. Deed was given by the trustee sixteen days before the Zug petition in intervention was filed, and the property was then in process of development. If title did not pass to the Bilyou lease by the transfer from the trustee in bankruptcy, it did not pass as to the other properties of the Lyvers Syndicate. Such holding would undo the entire transaction after creditors have been paid and the unit holders have accepted dividends, although very meager, out of the proceeds of the sale. The decree of the trial court we think must be sustained on the grounds herein indicated, and it is so ordered.

Affirmed.