**In re PITTSBURGH RYS. CO.**

Nos. 8964, 8967, 8996.

Circuit Court of Appeals, Third Circuit.

Argued April 1, 1946.

Decided May 7, 1946.

---

See, also, 63 F.Supp. 7.

Maurice J. Dix, of New York City (Charles B. Prichard, of Pittsburgh, Pa., and Joseph Nemerov and Aaron Schwartz, both of New York City, on the brief), for appellants Guggenheim.

Anne X. Alpern and Leon Wald, both of Pittsburgh, Pa., for appellant City of Pittsburgh.

Samuel M. Koenigsberg, of New York City (Roger S. Foster, Solicitor, of Philadelphia, Pa., Milton V. Freeman, Asst. Solicitor, of Washington, D. C., George Zolotar, Atty. Securities and Exchange Commission, of New York City, on the brief), for Securities & Exchange Commission.

H. F. Stambaugh, of Pittsburgh, Pa., for appellants Baker and others.

Thomas J. Munsch, Jr., of Pittsburgh, Pa. (C. Elmer Bown and Philip A. Fleger, both of Pittsburgh, Pa., on the brief), for Philadelphia Co.

Wm. S. Moorhead, of Pittsburgh, Pa. (Moorhead & Knox and Judson A. Crane, all of Pittsburgh, Pa., on the brief), for appellee Monongahela St. Ry. and others.

Richard W. Ahlers, of Pittsburgh, Pa., for Suburban Rapid Transit Co.

Walsh & Levine, of New York City (William F. Walsh, of New York City, of counsel), for Cornelius F. Sullivan and Richard F. Bohl, as committee for public holders of stock of Citizens Traction Co., an unguaranteed underlier.

J. Henry O'Neill, J. Garfield Houston, and Blaxter, O'Neill & Houston, all of Pittsburgh, Pa., for W. D. George, trustee.

Before BIGGS, GOODRICH and McLAUGHLIN, Circuit Judges.

GOODRICH, Circuit Judge.

The City of Pittsburgh petitioned the District Court to exercise jurisdiction in bankruptcy reorganization over all underliers of the debtor, Pittsburgh Railways Company, and to determine the rights and interests of all stockholders and creditors thereof. This case arises on appeal from the dismissal of that petition as recommended by the Special Master.

### History of the System.

The highly involved financial structure and complicated interrelation of companies in the Pittsburgh transportation system is responsible for our ultimate question of how far the District Court may reach in reorganizing to effectuate a financially operable system. For our purposes the story begins in 1902. Immediately prior to that time there were six principal systems in operation with a seventh being developed.[1] Philadelphia Company, the holding Company parent of the operating company, Pittsburgh Railways, through various agreements with the others, effectuated a single unified system by having all the properties transferred to the possession of Pittsburgh Railways, for operation. With the growth of the city in following years came expansion of the system. New companies were created in which Philadelphia Company controlled all the stock and had directorate majorities through interlocking. These companies secured the available new franchises and were then taken into the system as underliers. Inter se the status of the original companies has not been altered since the 1902 orientation.

Let us examine this original group. Pittsburgh Railways, the operating company (then known as Southern Traction Company), is entirely stock owned by the Philadelphia Company. Consolidated Traction Company is also a direct subsidiary of Philadelphia Company. United Traction Company on the other hand is a direct subsidiary of Pittsburgh Railways; Pittsburgh and Charleroi Street Railway Co. (hereafter Charleroi) is similarly controlled. Of the 49 companies that might be involved in a complete reorganization, 36 are directly or indirectly controlled by Philadelphia Company in much the same manner through stock majorities at various levels and interlocking directorates of various degrees. Monongahela Street Railway Company, the Suburban Rapid Transit Street Railway Company and Pittsburgh and Birmingham Traction Company (hereafter Birmingham) comprise the remainder of the original group. Their stock ownership is publicly controlled, though even here some Philadelphia Company infiltration has occurred. Thus it has a minority stock interest of 24.7% in Monongahela and of 6.6% in Suburban.

For convenience, the 36 companies under Philadelphia Company control may be called the "Philadelphia underliers". Monongahela, Suburban and Birmingham together with Birmingham's six lessor company affiliates may be designated the "guaranteed underliers" comprising nine companies. Finally, excluding three companies not now deemed essential to any reorganization plan, we have two remaining companies, each in turn having a single underlier. This last group of four we may term the "unguaranteed underliers". The reasons behind the distinction between Philadelphia underliers from the others is patent from what has been said. The distinction

---

[1] There were some other companies whose importance is negligible as the report of the Special Master indicates:

"82. Other Companies. In addition to the companies above named, which were the principal street railway companies in existence before the consolidation of 1902, there were also a few other companies which are still in existence. These include Cedar Avenue Street Railway Company * * * and Superior Avenue and Shady Avenue Street Railway Company * * * which were acquired by Philadelphia Company from Andrew W. Mellon * * * and the lines of which were leased to United for 30 years from December 31, 1913 * * * but which have since been abandoned. Other companies were acquired after 1902. In addition, there were a large number of companies then in existence which have since been merged or consolidated with existing companies * * *."

between guaranteed and unguaranteed underliers will become clearer as the facts are developed further.

All the various corporate units or divisions, by whatever name they are designated, are welded to the operating company, Pittsburgh Railways. Consolidated and United are linked with Pittsburgh Railways by operating agreements that have been in effect since 1902. Birmingham and Charleroi are tied to United by long term lease arrangements. Similarly, Monongahela and Suburban are tied to Consolidated by long term lease arrangements. Charleroi is not in the same class with Birmingham, Monongahela and Suburban, since they are publicly controlled while it is merely a Philadelphia underlier.

### Present Legal Problem.

The community need for operation of this public transportation system as an integrated unit is clear. It has, heretofore, been noted by this court.[2] During the argument some suggestion was made by certain of the appellees that separate operation of certain of the underlying systems was physically possible. We do not doubt that fact. A trolley company with a franchise entitling it to run its cars on two city blocks may physically travel up and down that route. But nobody would contend that this kind of arrangement gave the type of public transportation service that a modern community needs. So here, even though some of the underlying companies have franchises for routes of very considerable distance and could, in some instances, get patrons into the center of town under their own separate systems, it is not seriously claimed that this method of operation would adequately meet community

requirements. All the parties agree with the finding of the Master[3] that such operation, even though physically possible, would not be economically successful. It is quite obvious, we think, that the street car system must not only run its cars but pay its bills if it is to fulfil the community need it purports to serve.

Since 1938 this system has been in federal court and operated under trustees appointed by the court. This state of affairs cannot continue indefinitely and be utilized as a means of integration of a transportation system. A reorganization court is one in which an enterprise may be brought with a view to having its difficulties ironed out under the procedure Congress has provided for the purpose, but it never was intended as a permanent plan for running the business of the country. We are very firm in our conviction that this transportation system must find a way to work out its problems in court and be on its way to a solution presently or else be left to work out its own salvation by extra judicial arrangements. We do not propose to permit the parties to postpone the facing of their business questions indefinitely under the protection of a reorganization court. The Securities and Exchange Commission has cited authorities to the effect that straight bankruptcy proceedings are not available to the system companies.[4] The decision is in point but we are not called upon at this time to express either agreement or disagreement with the question there decided. If a plan of reorganization is not found and ordinary bankruptcy is not available, the debtor must leave the haven of the court below. It will be anybody's guess as to what will eventu-

---

[2] Pennsylvania Co. for Insurance, etc., v. Philadelphia Company et al., 3 Cir., 1920, 266 F. 1, 3.

[3] The Master's findings, accepted by the District Court, state: "761. If the three major systems which were operationally unified in 1902 were operated separately there would probably be an increase in the aggregate overhead expense * * *."

"774. It is found from the evidence that if the existing transportation system now operated by the Trustees of Pittsburgh Railways Company were di-

vided into three separate systems as hereinbefore considered, it would be financially impracticable to operate any of them without substantial reductions in their fixed charges, and no way has been shown whereby those fixed charges could be reduced which is not equally available for the reduction of the fixed charges of Pittsburgh Railways Company."

[4] Columbia Railway, Gas & Electric Co. v. State of South Carolina, 4 Cir., 1928, 27 F.2d 52, 59 A.L.R. 665; Bankr. Act, § 4, sub. a, 11 U.S.C.A. § 22, sub. a.

ate insofar as all security holders are concerned and public transportation in Pittsburgh by trolley cars virtually may cease.

We have then this situation: There is undoubted need on the part of Pittsburgh and the surrounding country for a unified transportation system. There is a necessity that that transportation system be put on a sound economic basis if it is to continue to do its public work. The reorganization court cannot indefinitely be called upon to provide that unification. The business problem appears pretty clear. Working out of the answer is no easy matter. We do not, in any way, pass upon the merits or demerits of the tentative plan which has been evolved.

Our problem at the present time is confined to a single but very important legal question. That question relates to the power of the court to grant the city's petition by pulling into the reorganization, willy nilly, the underliers. The learned District Judge had the question before him as did the Special Master appointed by him. The Master's report is full and complete and most carefully done; it is so thorough and well considered that all the parties in the argument before us have taken the facts as the Master found them. The controversy before us relates only to the legal conclusions to be drawn from the facts found. The District Judge said that, "The system should be reorganized as a unit if it can legally be done", and expressed regret that the guaranteed underliers and the Phila-

delphia underliers "have been unable to remove their objections."

We shall consider the problem based on the objection of the guaranteed underliers. If it should be found that the guaranteed underliers can be included in the reorganization it seems to us a very easy conclusion that the Philadelphia Company and all its corporate relatives, which are involved in the transportation of passengers in the City of Pittsburgh, can be brought in also.

### Position of Guaranteed Underliers.

The position of these guaranteed underliers is, up to now, a very happy one. They receive about half a million dollars a year [5] as return upon their leases regardless of what the system makes or loses. If there are not profits available the Philadelphia Company has to make good under its guarantee. They are not insolvent and so long as the Philadelphia Company has money enough in its treasury to pay its obligations it is not likely that they will be. They do no business except that connected with the receiving of this money and the paying out of it to security holders. They maintain separate books of account, have separate directors and, in fact, perform all the ritualistic acts which a careful lawyer would advise a corporation to do in order to maintain its appearance of corporate individuality. They, therefore, say with exceedingly effective formal logic: that they are no part of the debtor; that jurisdiction of the bankruptcy court over debtor's property [6] does not affect them; that whatever

---

[5] The Master's report points out:

"32. By reason of non-payment of rentals and interest due under the guaranteed leases, Philadelphia Company has become obligated to make substantial annual payments to the guaranteed underliers. * * * These payments include, however, interest on bonds held by Philadelphia Company and payments which (until 1943) were devoted to dividends which were in part paid back to Philadelphia Company. * * * In 1941, the net amount paid out by Philadelphia Company under the guaranteed leases was $467,413.52. * * * This sum does not include interest paid on the guaranteed General Mortgage Bonds of Pittsburgh Railways Company. Nor does it include payments for which Philadelphia

Company is now being sued in Common Pleas Court by the Guaranteed underliers for taxes." It should be added that Philadelphia Company has lost the tax suits so far instituted against it, and that including the bond interest of Pittsburgh Railways, but exclusive of the contested tax payments, the annual net payments under the guarantees amounts to $516,-422.

[6] The statutory language referring to exclusive jurisdiction in terms of "the debtor and its property" is stressed by the guaranteed underliers in support of these arguments.

The petition for reorganization was filed May 10, 1938, under § 77B of the Bankruptcy Act providing that the court shall "* * * have exclusive jurisdic-

financial unhappiness those closer to the operating company than they are may have, they, themselves, are not subject to be drawn into any reorganization.

The companies make the further point that some of the leases made by the underliers are exceedingly long term. Each of the three principal guaranteed underliers has a 900 year lease.[7] The underliers say that they are still the owners in fee of the property thus leased, that the tenant got only a leasehold and that such leases are recognized under Pennsylvania law as having the effect which the language of the documents say they have, and that Pennsylvania law controls. Therefore, say the underliers, it is impossible to get these properties into reorganization court on the basis that they are the properties of the debtor which actually operates them rather than the landlords under these long term leases.

We thus have a highly interesting contrast between a legal theory of corporate personality and the facts of transportation life as life is lived in Pittsburgh. It has been said above that the system operates as a unit. This is more clearly demonstrated when a few particulars are given. For instance, one trolley route covers thirty different franchise segments belonging to ten underliers. Other routes use the franchises of thirteen different underliers.[8] Operating employees know nothing about the separate underlying companies and neither does the travelling public.[9] All receipts are put in a common pot.[10]

■ As we see the question, the issue is whether the demand of the facts is to control or whether obeisance must be made to the doctrine of the separate corporate entities of all these concerns which, from the business point of view, constitute one operation and one enterprise. The learned trial Judge was concerned by the decision of this Court and of the Supreme Court in the Dipple case, as well he might have been. The situation here we think is not the same as that presented to us and subsequently to the Supreme Court in Philadel-

tion of the debtor and its property * * *" if an adjudicating order is made. 11 U.S.C.A. § 207.

The District Court on November 7, 1938 ordered that the Chandler Act, effective June 22, 1938, apply with respect to a plan of reorganization. Chapter X, § 111 of that Act reads: "Where not inconsistent with the provisions of this chapter, the court in which a petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and its property, wherever located." 11 U.S.C.A. § 511.

7 In all three instances negotiations were for 999 year leases, but 900 year terms were finally settled upon. Birmingham in turn has five 999 year leases and one 900 year lease under various subleasing arrangements it has made.

8 The Supreme Court has noted this unification. Philadelphia Co. v. Dipple, 1941, 312 U.S. 168, 170, 174, 61 S.Ct. 538, 539, 85 L.Ed. 651. "The debtor, Pittsburgh Railways Company, has, for many years, possessed and used the properties of some fifty-five street railway companies and has operated those properties, in connection with its own, as a unified street railway system in Pittsburgh, Pennsylvania, and surrounding territory."

"It is evident that the debtor has welded these underlying properties into one system in such fashion that a single route or a single passenger ride may involve the use of a number of the underlying companies' properties."

9 The Master's report states:

"244. * * * Indeed, no consideration whatsoever is given to the underliers in determining what maintenance is to be done, and the sole concern is the condition of the property as a whole. * * * The employees who maintain the property have no knowledge of the underlier groups and franchises, and it is not necessary in the performance of their work for them to know the lines of demarcation between the companies * * *."

"248. In general, in performing any of the functions of maintenance and operation of the system, the management pays no attention to the underlying companies except in maintaining records of replacements, renewals and retirements."

10 Philadelphia Co. v. Dipple, 1941, 312 U.S. 168, 174, 61 S.Ct. 538, 85 L.Ed. 651:

"Ascertainment of a proper apportionment of the receipts of the system as a whole to the respective contributions of the underlying companies' properties is obviously almost an impossible task."

"The Master has found, and the finding is not challenged, that there are no data available from which it can be determined what is the value of the various underlying properties or what is the fair value of their use."

phia Company v. Dipple, 1941, 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651, affirming In re Reorganization of Pittsburgh Rys. Co., 3 Cir., 111 F.2d 932. There the effort was to compel the trustees, in the same reorganization to pay the taxes of the underlying companies. This Court, affirmed by the Supreme Court, refused effect to that effort. This decision does not make the law of the case. It was concerned with the relations of the various companies in this system with each other. Because in that situation the Court treated the relations of the parties in the same terms as they themselves had chosen to assert, it does not follow that we must do so here. We now have the interests of creditors to consider, and even more significant, the highly important public interest of the people of a great city, in a transportation system which must be economically sound as well as physically efficient. The same considerations are dispositive of Monongahela Street Railway Co. v. Philadelphia Co. et al., 1944, 350 Pa. 603, 39 A.2d 909, where the Pennsylvania Supreme Court decided that Philadelphia Company had to pay taxes and bond interest according to contract and said the income taxes on the rentals were taxes on "earnings and profits". The duties of the parties to one another rest on contract. The duties of the parties to the public rest on broader considerations among which are the franchise rights received by the companies, rendering them quasi public corporations in character. Enforcement of the private rights does not bind the public duties nor take precedence over them.

■ A binding nature of Pennsylvania corporation and property rules has been urged upon us as indicated in the summary of the underliers' argument above. Under Pennsylvania statutes, there can be

no doubt that leasing arrangements of the instant sort are permitted,[11] as are unified operations.[12] Several things, however, must be remembered. First, every permission does not carry with it a corresponding prohibition. Logically it is a long leap from the premise that one may act to the conclusion that others may not disturb that action. The Pennsylvania statutes do not, nor could they, forbid or delimit the jurisdiction of a federal bankruptcy court. Second, the very statutes invoked indicate that their purpose is "to best accommodate public travel". It is of negligible persuasive force to cite permissive statutes when the resultant status thereunder is more of an obstacle than an aid in furthering the purpose of the statutes.

■ Finally, we are here concerned, not with the application of state law, but with the sweep of a federal statute dealing with a subject in which the Congress, under the Constitution, is empowered to act. Federal courts have been taught, since 1938, that in matters of state law they must conform strictly to the declarations of that law made by the state courts. But equally clearly, it is established that in determining the law applicable to the carrying out of federal powers, we are not bound by the provisions of the state law, but we are bound to interpret the provisions of the federal statutes in the best exercise of our own judgment. So here, granted that the inter-corporate relations set up among these concerns was a matter in the accomplishment of which they properly followed Pennsylvania law, it is now a question for the judicial application of the bankruptcy law to determine what effect those inter-corporate relations have in reorganization court.[13]

---

[11] Act of May 15, 1895, P.L. 63, 67 P.S. § 1279, permitting street railways to sell or lease property and franchises to traction companies.

Act of May 15, 1895, P.L. 64, 15 P.S. § 1894, permitting the same thing from one traction company to another.

[12] Act of May 15, 1895, P.L. 65, 15 P. S. § 1897: "it shall be lawful * * * to operate as a general system * * * different lines * * * which it thus owns, leases, controls or operates * * *."

[13] The problem, of course, cannot be

settled by looking to Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. There is good ground for viewing that decision as applicable only to diversity cases. Thus Clark, State Law in the Federal Courts (1946), 55 Yale L.J. 267, 280, 281, states: "In all discussions of the Tompkins doctrine, the Supreme Court has been careful to limit both its rationale and decision to diversity cases— a limitation almost pointedly stressed in its latest case decided last June [refer-

The effect of a grant of a corporate charter to a group of individuals is described in many ways in figurative language. Perhaps the favorite phrase is the "corporate veil" which courts are supposed to pierce from time to time as circumstances require. We think a more accurate figure is that of a cloak which on some occasions is to be worn and on other occasions is to be stripped off. To talk legal effect instead of fanciful figures of speech, the corporate fiction can be given effect in some instances and with perfect consistency, disregarded in other instances. Courts have recognized this.[14] As we have already said in the Dipple case, the courts recognized the separate existence of these corporate groups because the question was one of rights and duties among themselves. Since the parties had dealt with each other on the basis of separate personalities that effect was given to the transaction as to those who were parties to it. In this case the relationship of all the concerns in this transportation enterprise are with the creditors and with the public, and the considerations involved in recognizing separate corporate entities are quite different.

It is not claimed that there is any judicial precedent squarely on the point confronting us here. We do have, however, signposts to mark the way. There are a number of cases in which the fact that the principal corporation was in bankruptcy has brought with it into the bankruptcy court its subsidiaries, even though the latter, on the showing of their own separate corporate books, were not insolvent. In some of these cases, too, there was some factual as well as legal advantage to be gained by the existence of a separate entity.[15]

---

ring to Guaranty Trust Co. v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L. Ed. 2079, 160 A.L.R. 1231]. And one member of the Court has urged in a concurring opinion that the rule be thus limited. [Jackson, J., in D'Oench, Duhme & Co. v. F. D. I. C., 1942, 315 U.S. 447, 465, 62 S.Ct. 676, 86 L.Ed. 956]."

The Supreme Court has to a certain extent delimited the problem for us. Heiser v. Woodruff, 1946, 66 S.Ct. 853, 855: "For nothing decided in Erie R. Co. v. Tompkins, supra, requires a court of bankruptcy, in applying the statutes of the United States governing the liquidation of bankrupts' estates, to adopt local rules of law in determining what claims are provable, or to be allowed, or how the bankrupt's estate is to be distributed among claimants. [Citations]." See opinion for further discussion.

While the instant decision must stand on its own feet it may nonetheless be characterized as falling within the broad principles of Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838, rather than Erie R. Co. v. Tompkins. "The desirability of a uniform rule is plain" here as well as in the Clearfield case. Finally, if federal law governs in proofs of claim, distributions of assets and in judging the effects of inequitable conduct of a claimant, as stated in the Heiser case, then it is a short step farther to say that federal law must govern in determining what persons may be included in a bankruptcy reorganization.

14 See Irving Trust Co. v. Kaminsky,

D.C.S.D.N.Y.1936, 22 F.Supp. 362, citing Corsicana Natl. Bank v. Johnson, 1919, 251 U.S. 68, 88, 89, 40 S.Ct. 82, 64 L.Ed. 141.

15 Corporate entities have been disregarded under various circumstances. It is only fair to add that no set of circumstances adverted to below is indistinguishable from the instant situation. Language broad enough to act as a foundation for the present decision is not lacking in these cases, but in each instance the decision itself did not require such breadth.

This Court in Trustees System Co. of Pennsylvania v. Payne, 3 Cir., 1933, 65 F.2d 103, 107, an equity case, said "Through long practice courts have not hesitated to disregard the doctrine of corporate entities when the facts justify it." The parent company in that case was in receivership and the subsidiaries, though not alleged insolvent, were drawn in both because of the dominant relationship and to prevent the draining off of subsidiaries' assets by the parent receivers. A similar equity situation was presented by Commerce Trust Company v. Woodbury, 8 Cir., 1935, 77 F.2d 478.

In two bankruptcy cases, Central Republic Bank & Trust Co. v. Caldwell, 8 Cir., 1932, 58 F.2d 721 and Stone v. Eacho, 127 F.2d 284, 4 Cir., 1942, the parent bankrupt was found to have been in such close relationship to the subsidiaries that the latter were also brought in. The fact situation in the Central Republic case was in some respects weaker than in the instant case for there were separate operating employees and

Our conclusion is that the facts of the present case call for the treatment of this great transportation system as one entity for purposes of reorganization, regardless of the elaborate jig-saw puzzle arrangement of all the underlying companies which have gone into it. In so concluding we emphasize the nearly half century of physical operation of this enterprise as a unit, with the interchange of movable property, routes, operating personnel and everything involved on the business side. We recognize the necessity of the unitary economic foundation for it and the impossibility of accomplishing that if half a million dollars a year plus taxes is to be drained off by one group without regard to the situation of the whole. We are concerned with the realities of the situation, not the least of which is the projecting of a trolley transportation system almost a thousand years into a future of revolutionary travel changes in order to substantiate the existence and worth of reversionary fees simple. We think that the many years of factual unity and the public necessity for the measures which will insure the proper economic foundation for the system, override the arguments for the recognition of the legal concept of separate entity on the part of the underliers.

Having reached this conclusion with regard to the guaranteed underliers, it becomes unnecessary to discuss those companies which have not followed ritual so closely in preserving their own separate character. If guaranteed underliers, like the Monongahela group, are to be included in the reorganization, a fortiori the Philadelphia Company underliers and unguaranteed underliers are in also. It has already been said, but bears repetition, that we are in no way passing upon the fairness of any plan. That is not now before us.

The judgment of the District Court is reversed and the case remanded for further proceedings not inconsisent with this opinion.

the subsidiary had been fully independent until only a year prior to the bankruptcy reorganization of parent. As to whether the subsidiary should be declared a bankrupt and whether all its assets should be administered for the benefit of the parent the decision expressly reserved consideration. In the Stone case the subsidiary was adjudged a bankrupt also; the proceedings were consolidated with a pooling of assets.

Even in a case where straight bankruptcy proceedings, with liquidation and distribution of assets, have been held inapplicable, the reasoning is not without significance here. "A railway is a unit; it cannot be divided up and disposed of piecemeal like a stock of goods." Continental Illinois Nat. Bank & Trust Co. v. Chicago, R. I. & P. Ry. Co., 1935, 294 U.S. 648, 671, 55 S.Ct. 595, 604, 79 L.Ed. 1110.