In the Matter of CONTINENTAL VENDING MACHINE CORP. and Continental Apco, Inc., Debtors.

JAMES TALCOTT, INC., Appellant,

v.

Irving L. WHARTON, Trustee, Appellee.

No. 542, Docket 74–2233.

United States Court of Appeals, Second Circuit.

Argued April 1, 1975.

Decided June 5, 1975.

J. Jacob Hahn, Hahn, Hessen, Margolis & Ryan, New York City (Julius J. Abeson, New York City, of counsel), for appellant.

Charles Seligson, Weil, Gotshal & Manges, New York City (Joseph J. Marcheso, Gen. Counsel for Continental Vending Machine Corp., New York City, of counsel), for appellee.

Amicus brief filed by the SEC, David Ferber, Sol., SEC (Marvin E. Jacob, As-

sociate Regional Administrator, New York Regional Office, SEC).

Before ANDERSON, MANSFIELD and OAKES, *Circuit Judges.*

OAKES, *Circuit Judge:*

This appeal is by a secured creditor, James Talcott, Inc. (Talcott), in a Chapter X bankruptcy proceeding, 11 U.S.C. § 501 *et seq.*, involving a parent corporation, Continental Vending Machine Corp. (Continental), and its subsidiary, Continental Apco, Inc. (Apco). Talcott objects to an approved amended plan of reorganization for the two corporations because, while the plan calls for consolidation of the proceedings and treats the properties of the two debtors on the basis of a merger or consolidation of the two corporate entities, it provides that no secured creditor's claim shall be elevated or improved as a result of the consolidation. We are in short asked to determine whether it is "fair and equitable" under § 221 of the Bankruptcy Act (Act), 11 U.S.C. § 621, to disregard corporate lines and to consolidate or pool assets and liabilities for purposes of dealing with unsecured claims but not to do so for purposes of dealing with secured claims. We agree with the United States District Court for the Eastern District of New York, Jacob Mishler, *Chief Judge,* that the amended plan is "fair and equitable" since the absolute priority of Talcott to the specific assets pledged to it in connection with loans made to both the parent and subsidiary corporations has been preserved and that the Act does not require consolidation to be complete for all purposes. Accordingly, we affirm Judge Mishler's order approving the trustee's amended plan.[1]

Continental is a publicly owned Indiana corporation which at one time had a number of subsidiaries but for present purposes had only one of note, Apco, which it wholly owned. Apco was principally the sales arm for and Continental was the manufacturer of vending ma-

chines. Talcott financed each corporation, receiving mortgages of machines and other security devices from Continental covering its indebtedness, and assignments of accounts receivable and assorted other liens from Apco covering its indebtedness. The security agreements with each contained no cross-collateralization agreement, *i. e.*, no provision allowing Talcott to set off the obligations of one corporation against the collateral which it held to secure the debts of the related corporation, nor was there any guaranty by either Apco or Continental of the other's indebtedness. While the exact amounts are not yet ascertained, it appears that the liquidation of Talcott's security in Apco will leave at least a $380,000 surplus while the sale of the Continental security will result in a $820,000 deficit. Talcott, needless to say, would like to see its Apco lien apply to secure the Continental deficit. We point out that there is no evidence in the record that there were any intercompany transfers to the detriment of secured creditors, of which Talcott is now the only one remaining.

■ Appellant makes essentially two major points and a minor one. The first major one is that since improvement of some creditors' position is inherent in a consolidation it would be unfair and inequitable to permit the unsecured creditors to improve their position but to deny the secured creditor such improvement. The second major point is that the broad language of each of the security agreements giving Talcott a lien for "any and all obligations no matter how or when arising and whether under this or any agreement or otherwise . ." applied to permit the Apco lien to cover the Continental deficit. The minor point, which was raised "with reservations," was that the plan was accepted by creditors holding 71.8 per cent of the total amount of claims filed and allowed. Appellant maintains that the amount required under § 179 of the Act, 11 U.S.C.

---

1. As a statutory party, 11 U.S.C. §§ 572–73, 608, the Securities and Exchange Commission participated in the action below and supports the judgment.

§ 579, is 75 per cent; that section, however, requires acceptance by creditors "holding two-thirds in amount" of the claims filed and allowed as to each class, so that we fail to see any merit whatsoever to this argument. We take up the major points in reverse order.

■ Talcott had no lien on the Apco surplus for the Continental deficiency under any of its security agreements. The language of the Apco agreement, while broad, did not go so far as to cover the debts of Continental. There is nothing to indicate that the debt of Continental was the debt of Apco. It may be true that if the parties agree, the validity of a lien does not depend upon the existence of a contemporaneous debt. *In re Cichanowicz*, 226 F.Supp. 288 (E.D.N.Y.1964) (secured notes paid down to zero, subsequent advances held covered by original security). But this does not mean that the Apco lien would somehow remain attached to Apco surplus after application of the Apco collateral to satisfy its debt to Talcott. On the contrary, once that Talcott debt was satis-

fied, no further lien on Apco property could exist, because the obligation of Apco was paid in full. As was stated in *United States v. Phillips*, 267 F.2d 374, 377 (5th Cir. 1959), "In the absence of an obligation to be secured there can be no lien." [2]

■ We turn then to the question, one really of first impression, whether differentiation of secured from unsecured creditors in a consolidation upon reorganization is proper under the Act.[3] The power to consolidate is one arising out of equity, enabling a bankruptcy court to disregard separate corporate entities, to pierce their corporate veils in the usual metaphor, in order to reach assets for the satisfaction of debts of a related corporation. *Soviero v. Franklin National Bank of Long Island*, 328 F.2d 446 (2d Cir. 1964); *In re Cintra Realty Corp.*, 413 F.2d 302 (2d Cir. 1969); *Stone v. Eacho (In re Tip Top Tailors, Inc.)*, 127 F.2d 284, 288–89 (4th Cir.), *rehearing denied*, 128 F.2d 16, *cert. denied*, 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942); *Hillebrand v. Sav-Co*, 353 F.Supp. 19, 21

2. Appellant also argues that the "cram down" provisions of § 216(7) of the Act, 11 U.S.C. § 616(7), are applicable to the present case. This section of the Act sets out a procedure to be followed to effectuate the conformation of a reorganization plan even if the plan is not accepted by a class of creditors.

> A plan of reorganization under this chapter—
>
> . . . . .
>
> (7) shall provide for any class of creditors which is affected by and does not accept the plan by the two-thirds majority in amount required under this chapter, adequate protection for the realization by them of the value of their claims against the property dealt with by the plan and affected by such claims, either as provided in the plan or in the order confirming the plan, (a) by the transfer or sale, or by the retention by the debtor, of such property subject to such claims; or (b) by a sale of such property free of such claims, at not less than a fair upset price, and the transfer of such claims to the proceeds of such sale; or (c) by appraisal and payment in cash of the value of such claims; or (d) by such method as will, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection . . . ..

In the present case, however, this provision is inapplicable. As a secured creditor, Talcott is not "affected" by the amended plan within the meaning of the Act since its interests are not materially and adversely affected by the plan. As an *unsecured* creditor of Continental, Talcott is affected by the plan, but two-thirds of the class of unsecured creditors have accepted the plan and thus § 616(7) does not apply.

3. There is no question that there is such differentiation under the amended plan. Article I thereof defines claims to include all claims against both Continental and Apco "which, except for the Claims of Secured Creditors, are treated herein on a consolidated basis." Article II provides that their properties will be dealt with "on the basis of a merger or consolidation thereof, without prejudice to the rights of Secured Creditors with respect to specific collateral securing indebtedness." Article IV, after providing that to the extent a secured creditor's claims are not satisfied by the sale of specific lien property the creditor is treated as an unsecured creditor, expressly precludes "elevation or improvement of the status" of a secured creditor's claim "as a result of the consolidation of the Debtor's Estates."

(E.D.Ill.1972). While it does not require that the creditors knowingly deal with the corporations as a unit, *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845, 847 (2d Cir. 1966), it should nevertheless be "used sparingly" because of the possibility of unfair treatment of creditors who have dealt solely with the corporation having a surplus as opposed to those who have dealt with the related entities with deficiencies. *Id.*

■ Appellant argues that what is sauce for the goose is sauce for the gander; it would, however, swallow the sauce by improving its status from that of a now unsecured creditor of Continental to that of a secured creditor of Apco. It cites *Chemical Bank, supra,* as requiring this improvement or elevation, since there the consolidation that was ordered benefited the United States as a tax lienor. But *Chemical Bank* did not deal with consensual liens as here; it dealt with the statutory priority. Nothing in *Chemical Bank* suggests that the priority of the United States rested on a lien which attached to the consolidated assets; rather, combining the assets of the related companies simply made more money available for the estate, as to which, to be sure, there was a substantial priority claim. In *Chemical Bank* there was, moreover, every reason to believe that the Government as an unsecured creditor had, along with other unsecured creditors, suffered loss because of the indiscriminate shifting of assets between corporations. Here, as a secured creditor in both parent and subsidiary, Talcott's liens were in no way diminished or lien property transferred by virtue of intercorporate dealings. In the end, Talcott will obtain under the amended plan exactly what it bargained for with each in terms of security.

■ We have made it very plain that because consolidation in bankruptcy is "a measure vitally affecting substantive rights," the inequities it involves must be heavily outweighed by practical considerations such as the accounting difficulties (and expense) which may oc-

cur where the interrelationships of the corporate group are highly complex, or perhaps untraceable. *See In re Flora Mir Candy Corp.,* 432 F.2d 1060, 1062–63 (2d Cir. 1970). Thus, there is nothing to say for the proposition that in the exercise of the bankruptcy court's equity powers, *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934), it cannot treat unsecured claims as consolidated and secured claims as not. *See In re Pittsburgh Railways Co.,* 155 F.2d 477, 484 (3d Cir.), *cert. denied,* 329 U.S. 731, 67 S.Ct. 89, 91 L.Ed. 632 (1946). Nor is there anything in the Act itself requiring the symmetry on which appellant insists. As we have pointed out, note 2 *supra,* as a secured creditor of Apco, Talcott is not "affected" by the amended plan within the meaning of § 107 of the Bankruptcy Act, 11 U.S.C. § 507, because its interests are not materially or adversely affected by the plan. In the allowance or disallowance of claims, the court has the equitable power under § 2(a)(2) of the Act, 11 U.S.C. § 11(a)(2), to make certain that injustice or unfairness does not occur. *Pepper v. Litton,* 308 U.S. 295, 308, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Again, "The power of the bankruptcy court to subordinate claims or to adjudicate equities arising out of the relationship between the several creditors is complete." *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941). *See also Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946) (disallowing interest on interest as inequitable).

Finally it is suggested that the "absolute priority" rule, *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), requires that Talcott, as a secured creditor of Continental, also be treated as a secured creditor of Apco to the extent of the Apco surplus. We recognize that that rule makes a reorganization plan fair and equitable if and only if it provides participation for claims and interests in complete recognition of their strict priorities.

6A Collier, Bankruptcy ¶ 11.06 at 613 (14th ed. 1970). But, as we have said, Talcott is obtaining under the amended plan exactly what it bargained for: secured creditor status to the extent that its collateral was adequate. As to the balance of its claim it participates as an unsecured creditor with all the rights of such to the consolidated assets, *i. e.*, it is entitled to go against the Apco surplus as an unsecured creditor of Continental, along with all other unsecured group creditors. The absolute priority rule, as we see it, has therefore been followed.

Judgment affirmed.

ROBERT P. ANDERSON, *Circuit Judge* (dissenting):

The majority holds that it is "fair and equitable" under § 221 of the Bankruptcy Act (Act), 11 U.S.C. § 621, to disregard corporate lines and to consolidate or pool assets and liabilities for purposes of dealing with unsecured claims but not to do so for purposes of dealing with secured claims. On the basis of the facts before the court, I respectfully dissent.

James Talcott, Inc. (Talcott), the appellant, was the principal financier or "factor" [1] for both Continental Vending Machine Corp. (Continental), a manufacturer of vending machines, and for Continental Apco, Inc. (Apco), a Continental sales subsidiary. Although Talcott received mortgages on vending machines and other security devices from Continental covering its indebtedness, and assignments of accounts receivable, chattel security devices and various other liens covering Apco's indebtedness, the written security agreements covering the obligations of Continental and Apco each contained a provision which provided, in relevant part:

"You [i. e. Talcott] shall be entitled to hold all sums and all property of the undersigned, at any time to its credit or in your possession or upon or in which you may have a lien or security interest, as security for any and all obligations of the undersigned at any time owing to you and/or to any company which may now or hereafter be your subsidiary, no matter how or when arising and whether under this or any agreement or otherwise, and including all obligations for purchases made by the undersigned from any other concern factored by you or such subsidiary."

As noted by the majority opinion, however, neither security agreement contained a cross-collateralization provision, and neither Continental nor Apco formally guaranteed the other's indebtedness.

On April 8, 1963, a conservator was appointed for Continental on the application of the Securities and Exchange Commission. An involuntary petition in bankruptcy was filed on July 5, 1963, but this proceeding was superseded when involuntary petitions for reorganization were filed on July 10, 1963 and October 4, 1963, under Chapter X of the Bankruptcy Act with respect to Continental and Apco, respectively.

Upon commencement of the conservatorship for Continental and successive reorganization proceedings of Continental and Apco, Talcott began and thereafter continued liquidation of its security, which, as noted in the majority opinion, left a surplus of approximately $380,000 in the Apco account and a deficiency of approximately $820,000 in the Continental account. Talcott also made numerous loans during this period to the conservator and to the trustee, secured by trustee's certificates, none of which had been repaid by the time this appeal was commenced.

Although as early as 1964, Talcott's counsel advised the trustee that there would probably have to be a consolida-

---

**1.** The term "factor," while traditionally referring to a "sales agent who receives goods and sells them for a commission, having a possessor lien on such goods or their proceeds," today generally denotes "a person who lends or advances money on the security of inventory or accounts receivable." 68 *Am.Jur.2d Secured Transactions,* § 133 (1973). Talcott was a factor of the second variety.

tion of the two proceedings, it was not until June 13, 1969, when the trustee filed his report pursuant to § 167(5) of the Act, that he proposed such a consolidation. Thereafter, on June 20, 1969, he filed a consolidated plan of reorganization. About a year later, after several hearings on the proposed reorganization plan, an amended plan of reorganization was filed on June 15, 1970, which contained the proviso "Anything herein contained to the contrary notwithstanding, nothing in the Plan shall be, or be deemed to be an elevation or improvement of the status of a claim filed by any creditor in Class 5 [secured creditors] as a result of the consolidation of the Debtors' Estates." On May 20, 1971, an order, with findings, was entered approving the amended plan, but on January 14, 1972, Talcott filed objections to its confirmation. Although a hearing was held on January 21, 1972, an order overruling Talcott's objections and confirming the amended plan was not entered until August 12, 1974—over two and one-half years later. This appeal followed.

In refutation of Talcott's argument that the broad language of its security agreements permits its lien on the Apco surplus to cover the Continental deficit upon consolidation of the debts and assets of Apco and Continental, the majority holds that Talcott did not possess a valid lien on the Apco surplus at the time the consolidation was approved because, as a result of Talcott's prior liquidation of the Apco collateral the obligation of Apco had been paid in full. Although *In re Cichanowicz*, 226 F.Supp. 288 (E.D.N.Y.1964), stands for the proposition that under New York law a mortgage or other security agreement providing for future advances does not cease to exist merely because all earlier advances have been completely paid off (see G. Gilmore, *Security Interests In Personal Property*, Vol. II, § 35.3, at 924, n. 8 (1965)), the security agreement remains in existence only as to future advances of the "same class as the primary obligation . . . and so related to it that

the consent of the debtor to its inclusion may be inferred." *National Bank of Eastern Arkansas v. Blankenship*, 177 F.Supp. 667, 673 (E.D.Ark.1959), aff'd sub nom. *National Bank of Eastern Arkansas v. General Mills, Inc.*, 283 F.2d 574 (8 Cir. 1960). See also G. Gilmore, *Security Interests In Personal Property*, Vol. II, § 35.2 at 920; § 35.3 at 924–925; § 33.5 at 932 (1965). Any surplus remaining after the security of the defaulting debtor has been liquidated to satisfy the debt is, at least in the absence of an explicit agreement by debtor and creditor to the contrary, clearly not of the same class as the periodic future advances to a non-defaulting debtor contemplated under the typical inventory financing or receivables financing agreement.

If the validity of Talcott's claim necessarily depended upon the continued existence of a consensual lien on the Apco surplus under the broad provisions of Talcott's security agreement once the collateral had been liquidated, as assumed by the court below and as argued by the trustee on appeal, I would be in complete agreement with the majority's holding. As the majority opinion recognizes, however, there still remains the broader question whether differentiation between secured and unsecured creditors in a consolidation upon reorganization is proper under the Act. Under the circumstances present in this case, I believe that question must be answered in the negative.

In his June 13, 1969 report, filed pursuant to § 167(5) of the Bankruptcy Act, the trustee made the following statement based upon his investigation of the affairs of the two debtors:

"It is clear that the debtors were operated as a single economic unit with little or no attention paid to the needs of Apco or to Continental's other subsidiaries. Any plan of reorganization which is proposed for said debtors should provide for a merger of the assets and liabilities of the debtors and consolidation of the within proceedings."

Accordingly, in the plan of reorganization, filed June 20, 1969, the trustee proposed that "All Properties of Continental, Apco, Coast Automatic Vending Corp., Continental Apco of Canada, Ltd., and any of their subsidiary or affiliated corporations and their Trustee . . . be dealt with by the Plan, on the basis of a merger or consolidation thereof." The trustee also stated:

> "The bases for applicant's recommendation [that any plan of reorganization should provide for a merger of the assets and liabilities of the debtors and a consolidation of the within proceedings] are that . . ., (e) there were guarantees and cross-guarantees of each other's obligations by the debtors which, in addition to the complex pattern of borrowing transactions between the debtors, makes the task of separating the assets and liabilities of the debtors virtually impossible; (f) there is little, if any, likelihood that an attempt to reconstruct all or a substantial portion of the financial transactions which occurred between the debtors would be successful; and, the cost of such an attempt might well exceed $1,000,000; and (g) no assurance can be given that such a division could be accomplished, regardless of the amount of money, time and effort which might be expended in such an attempt."

These findings were not changed in the amended plan.

It is clear from the foregoing that the instant consolidation merely confirmed an implied merger of the two debtors which pre-dated the filing of the involuntary reorganization petitions. See *Page v. Arkansas Natural Gas Corpora-* *tion,* 53 F.2d 27 (8 Cir. 1931), *aff'd on other grounds,* 286 U.S. 269, 52 S.Ct. 507, 76 L.Ed. 1096 (1932). Because in legal effect Continental and Apco were one, prior to the initiation of these proceedings, and Talcott's security agreement with each contained the same broad dragnet clause, it follows that at the time the involuntary reorganization petitions were filed, Talcott's security agreements with Continental and Apco were in legal effect, one and the same.[2] See *Trustees System Co. of Pennsylvania v. Payne,* 65 F.2d 103 (3 Cir. 1933), in which the court held that the plaintiffs, as creditors of the parent corporation, had the equitable right to move for ancillary receivers of five subsidiary corporations which had not in fact maintained identities truly separate from the parent, because their character as creditors of the parent corporation extended to all the corporate departments or agencies it embraced; *Fitzgerald v. Central Bank & Trust Company,* 257 F.2d 118 (10 Cir. 1958), in which a secured claim of a bank, which had lent money under a chattel mortgage to the president of a corporation doing business in his separate legal identity as the corporation's sales company, was treated as the debt of both the corporation and the sales company.

The absence of a cross-collateralization provision in Talcott's security agreements is, therefore, irrelevant. Such a provision would only have been necessary if Continental and Apco had, in fact, been two separate and independent corporations, in which event there would be no need for the consolidation contemplated here, similar to that approved in *Chemical Bank New York Trust Company v. Kheel,* 369 F.2d 845 (2 Cir. 1966).[3]

---

2. Talcott is not contending, of course, that a creditor secured solely by an identifiable piece of property belonging to one of the debtors could improve his secured position by consolidation. It is the breadth of Talcott's dragnet clause and its inclusion in identical form in each agreement, which necessitates different treatment.

3. The court in *Kheel,* when discussing the necessity for substantive consolidation based upon the hopelessly intertwined dealings of the debtors gave no indication that such consolidation was to be used solely for the benefit of unsecured creditors. Similarly, *Kheel,* did not distinguish between secured and unsecured creditors when acknowledging the possible unfairness of consolidation to creditors who dealt solely with, or relied wholly on the assets of one of the debtors to be consolidated. While that question was not directly before the court, it was obvious that unsecured, as well as secured creditors, could so rely.

Equitable considerations also prompt me to note that had the trustee proposed a consolidated plan of reorganization *prior* to Talcott's liquidation of its Apco collateral,[4] he could not have maintained that Talcott did not have a valid lien on the Apco collateral then in Talcott's possession, and could not treat the debts of the two ostensibly independent corporations as one. It is hardly equitable now to hold that because the trustee took five years and the court took an additional five years to confirm that Continental and Apco had long been operated as a single economic entity, Talcott's claim can now be defeated, because meanwhile it had liquidated its collateral.

The majority, however, takes pains to point out that the court's power to consolidate is one arising out of equity; that it has the authority under § 2(a)(2) of the Act to insure that injustice is avoided; and that it can subordinate claims or adjudicate equities which have as their bases the relationships among the creditors. Thus, the majority concludes that in the exercise of the bankruptcy court's equity powers it can treat unsecured claims as consolidated and secured claims as not. I agree, but the majority has failed to demonstrate that equitable considerations justify this result in the instant case. In fact, the equities are in favor of Talcott as previously discussed; and there are no countervailing inequities for which it has been responsible. There is no indication that Talcott is guilty of any fraud or wrongdoing with respect to Continental, Apco, or any of the other creditors in these proceedings. Even though Talcott may have dealt separately with each debtor and relied on the assets of each for its protection, without knowledge that in fact Continental and Apco were operating as a hopelessly entwined, single entity, the same can be said for probably most, if not all, of the unsecured creditors. The relative equities of rely-

ing creditors versus non-relying creditors, secured and unsecured, were not explored below, and the whole thrust of *Kheel* is that in the "rare case" such as this, where the hopelessly confused interrelationships cannot be unscrambled without large expenditures of time and money, and even then with no assurance of success, the court may order consolidation "to reach a rough approximation of justice to some rather than deny any to all." *Chemical Bank New York Trust Company v. Kheel, supra,* at 847. Although Talcott might secure an advantage through consolidation that it otherwise would not have had, likewise an advantage accrues, solely because of the consolidation, to many of the unsecured creditors who otherwise would not have had it. Moreover, except for Talcott's large infusions of capital, there might now be nothing at all for the unsecured creditors.

The only equitable rationale put forward by the majority for distinguishing between secured and unsecured creditors in this case is the assertion that "Talcott's liens were in no way diminished or lien property transferred by virtue of intercorporate dealings." But there is no supporting evidence in the record and no finding to this effect in Judge Mishler's order conforming the trustee's amended plan of reorganization. Moreover, as noted by the court in *Kheel* and by the trustee in the instant case, consolidation was properly ordered in this case because it was virtually impossible to reconstruct intercorporate claims, transactions, liabilities and ownership of assets. For these very same reasons Talcott would undoubtedly find it equally impossible to demonstrate that its liens were diminished or lien property transferred even if it occurred. It certainly cannot be asserted with assurance, however, that money loaned by Talcott to Continental, and ostensibly secured, was not in fact turned over to Apco thereby creating the Continental "deficiency." It seems to me that

4. Cf. *Chemical Bank New York Trust Company v. Kheel,* 369 F.2d 845 (2 Cir. 1966), in which consolidation was approved pursuant to a motion by the United States, a major creditor, prior to the preparation and submission of a plan of liquidation.

the assumption underlying the type of consolidation present here and in *Kheel* is that the indiscriminate manipulation of the debtors was so extensive that neither the trustee nor the bankruptcy court could begin to sort out how each creditor or even classes of creditors were affected, and that *all* must have suffered, absent proof to the contrary. There is no such contrary proof here.

For the foregoing reasons, I would hold that Talcott had an equitable lien[5] on all the Apco collateral, including that now determined to be a "surplus," dating at the very least from the commencement of the reorganization proceedings. This lien was not dissipated by Talcott's liquidation of its Apco collateral, and permits Talcott, upon consolidation, to treat the debts of Continental as the debts of Apco under its security agreements, and to apply the so-called Apco "surplus" to the Continental deficiency. Accordingly, I would reverse.

---

5. The lien here invoked is the kind which the chancellor creates to do equity under the peculiar circumstances of the case, and, in particular, by the bankruptcy chancellor to implement a just reorganization. It can be described as a right, not existing at law, to have specific property applied in whole or in part to the payment of a particular debt and is based on general considerations of right and justice as applied to the relationship of the parties in the instant dispute. See generally, 51 *Am.Jur.2d Liens* §§ 22–25 (1970).